T.C. Memo. 2006-15

UNITED STATES TAX COURT

ELIZABETH GILES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16640-03.                    Filed January 31, 2006.

<u>B. Paul Husband</u>, for petitioner.

<u>Michael W. Berwind</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, <u>Judge</u>:  Respondent determined deficiencies of
$7,117, $5,470, and $6,793 and accuracy-related penalties under
section 6662(a) for 1999, 2000, and 2001, respectively (years in
issue).[1]  After concessions,[2] the issues for decision are:

---

[1]  Unless otherwise noted, all section references are to the
(continued...)

(1) Whether petitioner's horse activity was an activity engaged in for profit within the meaning of section 183 during the years in issue; and (2) whether petitioner is liable for accuracy-related penalties under section 6662(a) for 1999 and 2000.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference.

A.  Background

At the time she filed the petition, petitioner resided in Riverside, California.

Petitioner is a dentist licensed by the Dental Board of California.  Petitioner operates her own dental practice as a professional corporation, of which she is the sole shareholder. From 1988 through 2003, petitioner's average annual income from her dental practice was $109,547.  During the years in issue, petitioner reported income from her dental practice of $120,500, $106,250, and $138,250, respectively.

---

[1](...continued)
Internal Revenue Code, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]  Respondent concedes that petitioner has substantiated all expenses reported on Schedules C, Profit or Loss From Business, for the years in issue.  As a result, respondent concedes that there is no deficiency in 2001 and petitioner is not liable for an accuracy-related penalty relating to that year.

B.   Petitioner's Real Property

    1.   Falling Water Way

On July 27, 1983, petitioner purchased for $135,000 real property at 18500 Falling Water Way in Riverside, California (Falling Water Way).  Falling Water Way includes 1.48 acres of land, a 2,252-square-foot four-bedroom home, a garage, a four-stall barn with tack room, feed rooms, hay storage, an arena, and some paddocks.

Falling Water Way is in an area with many horse properties. Falling Water Way is zoned "Residential Agricultural" by Riverside County.  A Riverside County zoning ordinance allows the "noncommercial keeping of horses" in Residential Agricultural zones.  The zoning ordinance permits breeding and raising of horses but prohibits Falling Water Way from being used as a livery stable or a boarding stable.  The zoning ordinance limits the number of horses that can be kept at Falling Water Way to four.

Falling Water Way has been petitioner's principal residence since its purchase in 1983.  Petitioner put Falling Water Way up for sale in 1991 but did not sell the property.

As of June 15, 2004, Falling Water Way had a fair market value of $530,000.  The fair market value of the horse facilities and property, other than the house and the garage, was $375,000.

### 2. Gavilan Hills

In August 1990, petitioner purchased for $70,000 11.53 acres of undeveloped ranch land in the unincorporated Gavilan Hills area of Riverside County, California (Gavilan Hills). Gavilan Hills is approximately 5 miles from Falling Water Way. Between August and October 1990, petitioner engaged Wellmaster Drilling, Inc., to drill two wells at Gavilan Hills.

On October 7, 2003, Gavilan Hills was zoned "Residential Agricultural." The new zoning laws allow up to 24 horses to be kept on the property but prohibit the operation of a livery stable or boarding stable.

As of June 15, 2004, the fair market value of Gavilan Hills was $306,000.

### 3. Rialto Property

Petitioner has operated her dental practice at 350 North Riverside Avenue in Rialto, California (Rialto property), since 1983. The Rialto property consists of a 1,900-square-foot house zoned for professional office use.

From 1983 through 1995, petitioner's professional corporation leased the Rialto property. On November 17, 1995, petitioner purchased the Rialto property for $136,500. From 1996 through 2003, except for the year 2000, petitioner's professional corporation paid petitioner $24,000 annually for the use of the Rialto property. In 2000, petitioner's professional corporation

paid petitioner $22,000 for the use of the Rialto property. On her 1996 Federal income tax return, petitioner reported a rental loss of $12,357 as a result of significant repair expenses incurred upon acquisition of the property. From 1997 to 2003, petitioner reported average annual rental income of $7,871. During the years in issue, petitioner reported rental income of $7,944, $6,659, and $7,202, respectively.

C. Petitioner's Horse Activity

1. Background

Petitioner was raised around horses and showed horses as a child and young adult. In 1984, petitioner purchased her first horse, Feyras Raehele.

In 1988, petitioner commenced her horse activity at Falling Water Way under the name "Falling Water Arabians". Petitioner dealt only with purebred Arabian horses. At the time she started her activity, petitioner did not know how many Arabian horse breeders operated in California.

During the years in issue, petitioner used Falling Water Way for breeding, training, and working the horses. However, because petitioner has only 1.48 acres at Falling Water Way, she often took the horses to Gavilan Hills to exercise and train them.

During the years in issue, petitioner wormed and vaccinated her horses. Petitioner also ordered supplies and paid bills related to her horse activity.

Petitioner maintained a library of horse-related reference materials, including 15 books, 6 trade journals/periodicals, and 14 video sets. During the years in issue, petitioner spent 6 to 8 hours per month reading trade journals.

Petitioner had a Falling Water Arabians business card listing the Falling Water Way address as the business address. However, the business card was prepared in the late 1980s, and the phone numbers are no longer correct.

Petitioner maintained a checking account with California Bank & Trust in Moreno Valley, California, under the names Elizabeth Giles and Falling Water Arabians. From December 16, 1998, to December 3, 2001, the account's average daily balance never exceeded $402. A $9 maintenance fee was deducted from the account monthly. The only other withdrawal taken during this period was $240 on April 13, 2000, the purpose of which was not identified. As of April 17, 2001, the account had a negative balance of -40 cents. The only deposit made before December 4, 2001, was $9, deposited on May 5, 2001, in order to restore a positive account balance. On December 4, 2001, petitioner deposited $20,000 received from the sale of Bogaz, as discussed below.

During the years in issue, petitioner spent 4-1/2 to 6 hours a day with the horses. In a typical day, petitioner fed,

watered, administered necessary medications to, exercised, and trained her horses. In addition, petitioner cleaned stalls.

During the years in issue, petitioner showed two of her horses, Bogaz and Kart Blanche, five to six times per year. She did not show her other horses during the years in issue. At the shows, petitioner often rode the horses herself. Petitioner received only a few hundred dollars for showing the horses from 1999 through 2001. In 2001, petitioner switched to the show discipline of dressage.[3]

During the years in issue, petitioner did not ride her horses in parades. Petitioner did not attend any social or charity events relating to horses.

From 1988 to 2003, petitioner did not provide any services to third parties, including training, coaching, or boarding. From 1988 through 2000 and from 2002 through 2004, petitioner did not sell any horses. In 2001, petitioner sold only one horse, Bogaz.

2. Petitioner's Horses

In 1999 and 2000, petitioner owned the following horses: Feyras Raehele, Kart Blanche, Borissa, and Bogaz. Petitioner

---

[3] "Dressage" is a disciplined practice in which the horse is controlled in certain difficult steps and gaits by slight movements of the rider. Dressage is a competitive event in the Olympic Games, the Pan American Games, and other competitions. There are two introductory levels of dressage, four separate training levels, and four separate competitive levels.

also held future income interests, as discussed below, in TF Silent Reign in 1999, and in TF Silent Reign and Mon Reve in 2000.

At the beginning of 2001, petitioner owned Feyras Raehele, Kart Blanche, Borissa, and Bogaz and continued to hold future income interests in TF Silent Reign and Mon Reve.  During 2001, petitioner acquired Censuous by breeding.  In December 2001, petitioner sold Bogaz for $20,000.

Following is a description of petitioner's horses and related breeding activity.

### a.    Feyras Raehele and Kart Blanche

In 1984, petitioner purchased Feyras Raehele, an Arabian mare[4] foaled[5] on May 19, 1979.  During 1988, petitioner bred Feyras Raehele.  On April 21, 1989, Feyras Raehele produced a filly,[6] Kart Blanche.

### b.    Borissa, Bogaz, and Censuous

In 1989, petitioner leased Borissa, a mare foaled in 1982, from Raymond Mazzei of Furioso Farm for breeding purposes.  On

---

[4]  A "mare" is a female horse of reproductive age.

[5]  "Foaled" is synonymous with "born".  A "foal" is a baby horse of either sex.  "In foal" indicates that a mare is pregnant.  The gestation period for an Arabian horse is typically 11 months, but can be anywhere from 10 to 12 months.

[6]  A "filly" is a female horse 3 years old or younger.

March 1, 1990, Borissa produced a colt[7] named VT Kartel. After seeing VT Kartel, petitioner purchased Borissa for $2,500. VT Kartel died in 1991.

In 1990, petitioner again bred Borissa, who produced Bogaz on May 19, 1991. Petitioner did not breed Borissa from 1992 through 1996.

On June 17, 1997, petitioner entered into a breeding contract with Bishop Lane Farm to have Borissa bred to Bishop Lane Farm's stallions.[8] Borissa was in foal in 1997, but her foal died at birth in 1998. Upon the advice of Thomas Hoyme, D.V.M., Borissa was not rebred in 1998.

In 1999, petitioner sent Borissa to an equine breeding facility operated by Richard K. Tramp, D.V.M., for the purpose of breeding Borissa by use of shipped cooled semen. Despite this attempt, Borissa did not conceive in 1999.

In 2000, petitioner bred Borissa to Concensus, a stallion from Bishop Lane Farm. As a result, Borissa produced a filly named Censuous on March 20, 2001.

In 2001, petitioner sold Bogaz for $20,000. On December 4, 2001, petitioner deposited a $20,000 check received on the sale into the California Bank and Trust account described above.

---

[7] A "colt" is a male horse, not castrated, 3 years old or younger.

[8] A "stallion" is an adult male horse which has not been castrated.

Petitioner invested the $20,000 in an individual retirement account.

### c. TF Silent Reign and Mon Reve

Petitioner bought TF Silent Reign in 1989 for $3,500. In 1997, petitioner transferred TF Silent Reign to her daughter, Michelle Pope (Ms. Pope), for zero dollars. Petitioner and Ms. Pope had an oral agreement that Ms. Pope would breed TF Silent Reign and pay all related expenses, and they would split all future profits, if any, from the breeding.

In 1999, Ms. Pope bred TF Silent Reign to Monogramm, an Arabian stallion from Bishop Lane Farm. On March 8, 2000, TF Silent Reign produced a filly named Mon Reve.

### 3. Petitioner's Horse Activity Business Plans

### a. Annual Business Plans

Ms. Pope is a certified public accountant (C.P.A.). With the aid of Ms. Pope, petitioner prepared "annual business plans" for the years 1989 through 1994. Each annual business plan is a one-page fill-in-the-blank form with handwritten responses. Each annual plan was prepared in the spring or summer of the year to which it relates.

In the 1989 annual plan, petitioner listed her long-term goals as "Sell Borissa's foal. Estimate value after one year 7,000 to 10,000. Rah's [Feyras Raehele's] foal for show estimate value if National winner approximately 50,000."

In the 1990 annual plan, petitioner listed her long-term goals as "Breeding/Selling" and "Training horses for added value."  Under "plans for next year," petitioner listed "Seek better trainer with better reputation."

In the 1991 annual plan, petitioner listed her long-term goals as "Sell * * * [Falling Water Way] to set up business in * * * [Gavilan Hills] for expansion.  Breed, Show, Sell."

In the 1992 annual plan, petitioner listed her long-term goals as "Move to Gavilan Hills for expansion."  Under short-term goals, petitioner listed "TF Silent Reign to Nationals with David Garrett."  David Garrett is a trainer with whom petitioner consulted about breeding, training, and showing.

In the 1993 annual plan, petitioner listed her long-term goals as "Move to Gavilan Hills . . . Breed & Sell."  Under "Changes/Decisions to Decrease Chances of Failure and Increase Revenues," petitioner stated "self train and self vet."

In the 1994 annual plan, petitioner listed her long-term goals as "Same as '93 Goals."  Under "successes," petitioner stated "Found Lou Roper."  Petitioner consulted with Lou Roper, a national champion in the discipline of trail and hunting pleasure, on horse training.

> b.   General Business Plan

Petitioner and Ms. Pope also prepared a "general business plan" concerning petitioner's horse activity.  Similar to the

annual plans, the general plan is a one-page fill-in-the-blank form with handwritten responses. Petitioner listed her objectives as "Breed, Raise, Show to Increase Value, Sell." Petitioner listed areas of opportunity for profit as "Selling Quality Show horses." Petitioner stated that she hoped to start making a profit in 7 years. It is not clear from the record when the general plan was prepared or whether it related to any specific years.

4. Income and Expenses From Petitioner's Horse Activity

After the close of each year, Ms. Pope compiled canceled checks and credit card receipts and used these to categorize expenses and prepare profit and loss statements. The profit and loss statements do not identify the costs specifically connected with each horse. The profit and loss statements do not indicate what accounts the checks were drawn on.

Charles E. Wessman (Mr. Wessman), a C.P.A., used the profit and loss statements to prepare petitioner's Schedules C, Profit or Loss From Business. Petitioner's Schedules C for 1988 through 2003 reflect the following:

| Year | Gross Receipts | Veterinary Expenses | Advertising Expenses | Total Expenses | Profit/(Loss) |
|------|---------------|--------------------|--------------------|---------------|---------------|
| 1988 | $95 | $222 | $742 | $27,782 | ($27,687) |
| 1989 | 3,508 | 1,304 | 34 | 32,244 | (28,736) |
| 1990 | 244 | 3,410 | 135 | 38,197 | (37,973) |
| 1991 | -0- | 1,803 | -0- | 28,136 | (28,136) |
| 1992 | 3,000 | 2,434 | -0- | 32,545 | (29,545) |
| 1993 | 3,200 | 899 | -0- | 46,622 | (43,422) |
| 1994 | 4,080 | 5,322 | -0- | 38,152 | (34,072) |
| 1995 | 2,500 | 2,377 | -0- | 40,703 | (38,203) |
| 1996 | 3,024 | 1,272 | 1,837 | 40,337 | (37,313) |
| 1997 | 260 | 1,382 | 25 | 24,475 | (24,215) |
| 1998 | 500 | 1,453 | -0- | 21,568 | (21,068) |
| 1999 | 900 | 2,614 | -0- | 23,677 | (22,777) |
| 2000 | 1,000 | 1,731 | -0- | 18,649 | (17,649) |
| 2001 | 20,000 | 947 | -0- | 19,791 | 209 |
| 2002 | -0- | 3,101 | -0- | 27,072 | (27,072) |
| 2003 | 200 | 1,398 | -0- | 23,621 | (23,421) |
| Total | 42,511 | 31,669 | 2,773 | 483,571 | (441,080) |

D.   Tax Treatment of Petitioner's Horse Activity

1.   Audit of Petitioner's 1991 and 1992 Tax Returns

In 1994, Internal Revenue Agent W. Dillard conducted a field audit of petitioner's 1991 and 1992 tax returns, specifically examining petitioner's Schedule C horse activity under the passive activity rules of section 469.  Mr. Wessman handled the audit on behalf of petitioner.  On May 9, 1995, respondent sent petitioner a letter stating:  "We examined your tax return[s] [for 1991 and 1992] and made no changes to the tax you reported."

2.  Prior Tax Court Case Involving 1997 and 1998

Respondent audited petitioner's 1997 and 1998 Federal income tax returns, specifically examining petitioner's Schedule C horse activity under the hobby loss rules of section 183. Respondent determined that petitioner's horse activity was not an activity engaged in for profit and disallowed losses taken from that activity. Petitioner filed a petition with this Court at docket No. 10918-02 contesting respondent's determination. On February 22, 2005, Judge Laro entered his decision for respondent. See Giles v. Commissioner, T.C. Memo. 2005-28. Petitioner appealed to the Court of Appeals for the Ninth Circuit, which dismissed the case on August 11, 2005.

3.  The Years in Issue

Petitioner timely filed Federal income tax returns for the years in issue. These returns were prepared by Mr. Wessman. Attached to each return was a Schedule C listing "breeding & competing horses" as the principal business and "Falling Water Arabians" as the business name.

In 1999, petitioner deducted a Schedule C loss of $22,777 and reported adjusted gross income of $106,583. On the attached Schedule C, petitioner reported gross income of $900 and total expenses of $23,677.

In 2000, petitioner deducted a Schedule C loss of $17,649 and reported adjusted gross income of $95,291. On the attached

Schedule C, petitioner reported gross income of $1,000 and total expenses of $17,649.

In 2001, petitioner reported Schedule C income of $209 and adjusted gross income of $145,683. On the attached Schedule C, petitioner reported gross income of $20,000 and total expenses of $19,791.

On March 3, 2003, respondent sent petitioner an initial contact letter asking her to produce books, records, and work papers used to prepare her Schedule C for 1999. Petitioner did not produce any books, records, or other work papers in response to the initial contact letter. Respondent subsequently expanded the examination to include 2000 and 2001.

On March 18, 2003, respondent sent petitioner a 30-day letter covering 1999, 2000, and 2001. Petitioner was given the opportunity to sign a period of limitations extension, but refused to do so. At the time, petitioner had already filed a petition with this Court relating to 1997 and 1998. Petitioner wished to add the 1999, 2000, and 2001 years to the prior case. In an effort to consolidate the cases, petitioner forewent the administrative appeal process for the years in issue. The cases were never consolidated.

On June 26, 2003, respondent mailed petitioner a notice of deficiency for the years in issue. Respondent determined that petitioner's horse activity expenses were not ordinary and

necessary business expenses. Respondent disallowed petitioner's Schedule C losses of $22,777 and $17,649 for 1999 and 2000, respectively. Respondent also disallowed petitioner's Schedule C expenses of $19,791 for 2001. Respondent determined deficiencies of $7,117, $5,470, and $6,793 for 1999, 2000, and 2001, respectively. In addition, respondent determined petitioner was liable for accuracy-related penalties under section 6662(a) for the years in issue.

On September 9, 2003, petitioner filed a petition with the Court disputing the notice of deficiency.

OPINION

A. Petitioner's Horse Activity

The first issue for decision is whether petitioner's horse activity was an activity engaged in for profit within the meaning of section 183 during the years in issue.[9]

Section 183(a) provides that if an individual engages in an activity but does not engage in that activity for profit, "no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." In the case of

---

[9] Generally, a taxpayer bears the burden of proving the Commissioner's determinations incorrect. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). However, under sec. 7491(a), the burden of proof may shift to the Commissioner in certain situations. Petitioner contends that sec. 7491(a) requires respondent to bear the burden of proof. We need not decide this issue because our findings and analysis in this case are based on the record before the Court and do not depend on which party bears the burden of proof.

an activity not engaged in for profit, section 183(b)(1) allows deductions which are otherwise allowable without regard to whether the activity is engaged in for profit.  Section 183(b)(2) allows deductions that would be allowable if the activity were engaged in for profit, but only to the extent of gross income received from the activity.  Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."[10]

The Court of Appeals for the Ninth Circuit, to which an appeal of this case would lie absent stipulation otherwise, has held that for a deduction to be allowed under section 162 or section 212(1) or (2), the taxpayer must establish that she engaged in the activity with "the predominant, primary or principal objective" of realizing an economic profit independent of tax savings.  Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), affg. T.C. Memo. 1991-212; see also Skeen v. Commissioner, 864 F.2d 93, 94 (9th Cir. 1988)), affg. Patin v. Commissioner, 88

---

[10]  Sec. 162 allows a taxpayer to deduct ordinary and necessary expenses of carrying on the taxpayer's trade or business.  Pars. (1) and (2) of sec. 212 allow the taxpayer to deduct expenses incurred in connection with an activity engaged in for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.

T.C. 1086 (1987); Indep. Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 726 (9th Cir. 1986), affg. Lahr v. Commissioner, T.C. Memo. 1984-472.

Factors to be considered in determining whether an activity is engaged in for profit include:  (1) The manner in which the taxpayer carries on the activity, (2) the expertise of the taxpayer or her advisers, (3) the time and effort expended by the taxpayer in carrying on the activity, (4) the expectation that assets used in the activity may appreciate in value, (5) the success of the taxpayer in carrying on other similar or dissimilar activities, (6) the taxpayer's history of income or losses with respect to the activity, (7) the amount of occasional profits, if any, which are earned, (8) the financial status of the taxpayer, and (9) the elements of personal pleasure or recreation.  Indep. Elec. Supply, Inc. v. Commissioner, supra at 726-727; Antonides v. Commissioner, 91 T.C. 686, 694 n.4 (1988), affd. 893 F.2d 656 (4th Cir. 1990); Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(b), Income Tax Regs.  No single factor or group of factors is determinative.  Golanty v. Commissioner, supra at 426; Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980); sec. 1.183-2(b), Income Tax Regs.  A final determination is made only after considering all facts and circumstances.  Indep. Elec. Supply,

Inc. v. Commissioner, supra at 727; Antonides v. Commissioner, supra at 694; Golanty v. Commissioner, supra at 426.

"The proper focus of the test * * * is the taxpayer's subjective intent. * * * However, objective indicia may be used to establish that intent." Skeen v. Commissioner, supra at 94; see also Wolf v. Commissioner, supra at 713; Indep. Elec. Supply, Inc. v. Commissioner, supra at 726. The expectation of making a profit need not be reasonable. Beck v. Commissioner, 85 T.C. 557, 569 (1985); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Golanty v. Commissioner, supra at 425-426. However, greater weight is given to objective facts than to a taxpayer's self-serving statement of intent. Indep. Elec. Supply, Inc. v. Commissioner, supra; Antonides v. Commissioner, supra; Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986).

Respondent determined that petitioner did not engage in her horse activity with an intent to derive a profit and therefore disallowed the Schedule C loss deductions. Petitioner contends that she engaged in her horse activity with an intent to derive a profit and is therefore entitled to deduct from her gross income Schedule C losses relating to that activity. To make our determination, we address the nine factors found in section 1.183-2(b), Income Tax Regs.

1.  Manner in Which Petitioner Carried On the Horse Activity

To determine whether a taxpayer carried on an activity in a businesslike manner, three subfactors may be considered.  Sec. 1.183-2(b)(1), Income Tax Regs.

    a.  Complete and Accurate Books and Records

The fact that the taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity is engaged in for profit. Elliott v. Commissioner, 90 T.C. 960, 972 (1988), affd. without published opinion 899 F.2d 18 (9th Cir. 1990); Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); sec. 1.183-2(b)(1), Income Tax Regs.

Petitioner asserts that she kept complete and accurate books and records and argues that respondent's concession that she substantiated her Schedule C expenses so indicates.  Annual profit and loss statements were introduced into evidence for the years 1988 through 2003, including the years in issue.  These statements were prepared by Ms. Pope and used by Mr. Wessman to prepare petitioner's Schedules C.

Although petitioner's annual profit and loss statements were sufficient to substantiate her Schedule C expenses, these statements are not indicative that the horse activity was carried on for profit for the purposes of section 1.183-2(b)(1), Income Tax Regs.  This Court has stated:

> The purpose of maintaining books and records is more
> than to memorialize for tax purposes the existence of
> the subject transactions; it is to facilitate a means
> of periodically determining profitability and analyzing
> expenses such that proper cost saving measures might be
> implemented in a timely and efficient manner. * * *

Burger v. Commissioner, T.C. Memo. 1985-523, affd. 809 F.2d 355
(7th Cir. 1987); see also Golanty v. Commissioner, supra at 430;
McKeever v. Commissioner, T.C. Memo. 2000-288; Wesinger v.
Commissioner, T.C. Memo. 1999-372.  Even though a sophisticated
accounting system is not necessary, "the usage of cost accounting
techniques that, at a minimum, provide the entrepreneur with the
information he requires to make informed business decisions" is
essential.  Burger v. Commissioner, supra; see also Golanty v.
Commissioner, supra; McKeever v. Commissioner, supra; Wesinger v.
Commissioner, supra.

Petitioner introduced no evidence that she kept track of
expenses throughout the year.  The statements categorized
expenses, but her records did not break down the expenses by
horse, by month, or by any other means.  Further, the record is
devoid of any evidence that petitioner used the statements in
making decisions about the operation of her horse activity.  We
find that petitioner's annual profit and loss statements were
nothing more than records compiled at the end of each year and
used exclusively to prepare her Schedules C.  Petitioner did not
use the statements to make informed business decisions.

This subfactor weighs in favor of respondent's position.

b.   Conduct Substantially Similar to That of Other
     Profitable Activities

When the taxpayer conducts the activity in a manner substantially similar to that of other activities of the same nature which are profitable, a profit motive may be indicated. Enqdahl v. Commissioner, supra at 666-667; sec. 1.183-2(b)(1), Income Tax Regs.  Petitioner presented no evidence on how profitable horse breeding operations are run.  However, generally relevant indicators may include advertising, maintaining a separate business bank account, developing a written business plan, and having a plausible strategy for earning a profit.  See Morley v. Commissioner, T.C. Memo. 1998-312; Butler v. Commissioner, T.C. Memo. 1997-408; De Mendoza v. Commissioner, T.C. Memo. 1994-314; Ellis v. Commissioner, T.C. Memo. 1984-50.

In the 11 years prior to the years in issue, petitioner deducted less than $2,800 of advertising and promotion costs. During the years in issue, petitioner did not advertise in trade magazines, journals, or other publications, and she deducted no advertising or promotional costs on her Schedules C.  Petitioner testified that she felt showing horses was the best form of advertising and used competitions as her primary method of promotion.

The Court recognizes that showing horses may be one method of advertising.  However, given that petitioner's activity is breeding and selling horses, and that petitioner sold only one

horse from 1988 through 2003, we find that her failure to advertise in an attempt to reach a larger customer base is not consistent with a profit motive. See Dodge v. Commissioner, T.C. Memo. 1998-89, affd. without published opinion 188 F.3d 507 (6th Cir. 1999).

Petitioner maintains a separate bank account under the names Elizabeth Giles and Falling Water Arabians. However, it is clear from the record that petitioner did not use the account in conducting her horse activity. From December 16, 1998, to December 3, 2001, petitioner made a single withdrawal of $240, not including the monthly deductions for maintenance fees. The purpose of the withdrawal was not identified in the record. In addition, Ms. Pope testified that the canceled checks she used to prepare petitioner's annual profit and loss statements were not from the Elizabeth Giles and Falling Water Arabians bank account.

During the years in issue, there were only two deposits into the account. On May 5, 2001, petitioner deposited $9 in order to restore a positive account balance. On December 4, 2001, petitioner deposited $20,000 received from the sale of Bogaz. Petitioner invested the $20,000 in an individual retirement account, which is clearly not related to her horse activity. On the basis of the above, we find that petitioner did not maintain the bank account in a businesslike manner.

Petitioner and Ms. Pope prepared annual business plans for the years 1989 through 1994 and one undated general business plan. These plans were on fill-in-the-blank forms with hand-written responses. In each plan, petitioner listed as a long-term goal to sell horses. In her 1991 through 1994 plans, petitioner stated that her goal was to move her horse activity to Gavilan Hills.

While petitioner had business plans for previous years, she had no business plans for the years in issue. Petitioner introduced no evidence that she referred to the business plans during the years in issue. Despite petitioner's stated goal of selling horses, petitioner sold only one horse in 2001, 7 years after the last business plan was prepared. Despite petitioner's stated goal of moving her horse activity to Gavilan Hills, from 1991 through the years in issue petitioner took no meaningful steps to make the property suitable for accommodating the activity. We find that no positive inference can be drawn from petitioner's business plans.

Petitioner continually asserts that she is in the business of breeding and selling horses and intends to make a profit. Since 1989, petitioner has bred only Borissa. In that time, Borissa's 1990 foal died in 1991, she was not bred from 1992 through 1996, her 1998 foal died at birth, and she was not able to conceive by artificial insemination in 1999. In 15 years,

Borissa has produced only two surviving horses, Bogaz and Censuous. Despite the many breeding problems, petitioner testified that she considered Borissa to be her best breeding mare.

Petitioner also testified that she intends to offer services to third parties, including training, coaching, and boarding. Yet since 1988, petitioner has offered no such services. In addition, the zoning restrictions at Falling Water Way and Gavilan Hills prohibit petitioner from operating boarding or livery stables on the properties. Petitioner has pointed to nothing else from which she intends to derive a profit. On the basis of these facts, we find that petitioner does not have a plausible strategy for earning a profit.

Petitioner has introduced no evidence that she operated her horse activity in a manner similar to that of profitable horse-breeding businesses. None of the generally relevant indicators described above could lead us to conclude that petitioner operates her horse activity in a manner consistent with a profitable venture of any type. This subfactor weighs heavily in favor of respondent's position.

c. Changes To Improve Profitability

When a taxpayer changes operating methods, adopts new techniques, or abandons unprofitable methods in a manner

consistent with an intent to improve profitability, a profit motive may be indicated. Sec. 1.183-2(b)(1), Income Tax Regs.

Petitioner argues that she has changed her methods over the years in an effort to improve profitability. To advance this argument, petitioner testified that: (1) From 1992 through 1996, she stopped breeding her horses because she perceived a downturn in the Arabian horse market; (2) she began vaccinating, worming, and performing other basic veterinary services to save money; and (3) in 2001, she switched show disciplines to dressage because she felt dressage was becoming more popular.

Petitioner introduced no evidence to corroborate her testimony that there was a downturn in the Arabian horse market in the mid-1990s. Even if we accept petitioner's statements as fact, the halt in her breeding activity would not weigh in her favor. Petitioner reported the following total expenses from her horse activity on her Schedules C:

| Year | Total Expenses |
|------|----------------|
| 1988 | $27,782 |
| 1989 | 32,244 |
| 1990 | 38,197 |
| 1991 | 28,136 |
| 1992 | 32,545 |
| 1993 | 46,622 |
| 1994 | 38,152 |
| 1995 | 40,703 |
| 1996 | 40,337 |
| 1997 | 24,475 |
| 1998 | 21,568 |
| 1999 | 23,677 |
| 2000 | 18,649 |
| 2001 | 19,791 |
| 2002 | 27,072 |
| 2003 | 23,621 |

During the period that petitioner stopped breeding her horses, her total annual expenses were actually higher than during most years in which she was breeding them. Petitioner testified that she felt breeding would be unprofitable during the perceived downturn. However, petitioner did not state how, if at all, her decision would decrease expenses or otherwise improve profitability.

In her 1993 annual business plan, petitioner indicated that she could lower costs by performing basic veterinary work. It is unclear from the record when petitioner began performing this work. On petitioner's Schedules C, she reported the following veterinary expenses:

| Year | Veterinary Expenses |
|------|---------------------|
| 1988 | $222 |
| 1989 | 1,304 |
| 1990 | 3,410 |
| 1991 | 1,803 |
| 1992 | 2,434 |
| 1993 | 899 |
| 1994 | 5,322 |
| 1995 | 2,377 |
| 1996 | 1,272 |
| 1997 | 1,382 |
| 1998 | 1,453 |
| 1999 | 2,614 |
| 2000 | 1,731 |
| 2001 | 947 |
| 2002 | 3,101 |
| 2003 | 1,398 |

There is no discernable pattern to the reported veterinary expenses that would indicate veterinary costs decreased as a result of petitioner's performing some veterinary services on her own.

Petitioner testified that, in 2001, she switched show disciplines from western pleasure and trail to dressage because she perceived a greater demand for dressage horses. Petitioner presented no evidence that corroborates her perception. Petitioner did not indicate that her horses were marketed differently or how the switch in show disciplines would otherwise affect the profitability of petitioner's horse activity.

On the basis of the above, we cannot infer that petitioner's decisions to halt breeding, perform veterinary services, or switch show disciplines were made in a manner consistent with an intent to improve profitability. Petitioner has not shown that

the changes had or will have a material impact on her horse activity's profitability. See Golanty v. Commissioner, 72 T.C. at 428 (changes must be sufficient to change materially the prospect of profitability); McKeever v. Commissioner, T.C. Memo. 2000-288. Accordingly, this subfactor weighs in favor of respondent's position.

### d. Other Considerations

Petitioner has a Falling Water Arabians business card. However, this card was prepared in the late 1980s, and the phone numbers are no longer correct. The existence of an out-of-date business card does not weigh in favor of petitioner's position.

Petitioner keeps extensive records of health, certification, and pedigree, as well as promotional materials used in picking stallions to breed Borissa to, and correspondence with other parties regarding her horse activity. However, the keeping of these records is as consistent with a hobby as with a business. See Golanty v. Commissioner, supra at 430; Burger v. Commissioner, T.C. Memo. 1985-523. The existence of these records does not weigh in favor of petitioner's position.

Petitioner argues that her decision to lease Borissa before buying her evidences businesslike behavior. Petitioner introduced no evidence that this is a common practice in profitable horse-breeding businesses. This decision does not weigh in favor of petitioner's position.

e.    Summary

Taking into consideration the above, we conclude that petitioner did not operate her horse activity in a businesslike manner.  This factor weighs in favor of respondent's position.

2.    Expertise of Petitioner or Her Advisers

Preparation for an activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate a profit motive.  Engdahl v. Commissioner, 72 T.C. at 668; Lundquist v. Commissioner, T.C. Memo. 1999-83, affd. 211 F.3d 600 (11th Cir. 2000); sec. 1.183-2(b)(2), Income Tax Regs.  Efforts to gain experience and a willingness to follow expert advice may also indicate a profit motive.  Dworshak v. Commissioner, T.C. Memo. 2004-249; Lundquist v. Commissioner, supra.

Petitioner has been involved with raising and showing horses since she was a child.  Petitioner has consulted many professionals regarding breeding and training horses, including David Garrett and Lou Roper.  In addition, petitioner has read many books and publications regarding the breeding and training of horses.  While petitioner undoubtedly has expertise in breeding and training, her expertise does not extend to the economics of the undertaking.

Petitioner testified that, when she started her horse activity, she had no idea how many Arabian horse breeders there

were in California.  Petitioner presented no evidence that she was aware of the state of the market or other factors that may affect profitability.  "While a formal market study is not required, a basic investigation of the factors that would affect profit is."  Burger v. Commissioner, supra; see also Golanty v. Commissioner, supra at 432; Wesinger v. Commissioner, T.C. Memo. 1999-372.

Petitioner testified that she discussed aspects of her horse activity with two C.P.A.s, Ms. Pope and Mr. Wessman, which their testimony corroborated.  However, it is unclear whether they discussed anything more than petitioner's expenses in preparing the annual profit and loss statements and Schedules C.  While Ms. Pope and Mr. Wessman may have expertise in accounting, neither testified to having experience in running a profitable horse-breeding business.  Since 1988, petitioner has not consulted with experts regarding the economic aspects of running a profitable horse-breeding business.  Considering petitioner's long history of losses, this is not indicative of a profit motive.  See Golanty v. Commissioner, supra at 432; Wesinger v. Commissioner, supra; Hillman v. Commissioner, T.C. Memo. 1999-255; Dodge v. Commissioner, T.C. Memo. 1998-89.

None of petitioner's reference materials and publications were devoted to the business aspects of horse breeding.  Petitioner testified that only one of the references in her

library might possibly contain information regarding the business aspects of horse breeding. She further testified that some of the monthly publications contained business information. However, petitioner did not testify to how she used this information, if at all, in her activity.

On the basis of the above, we conclude that petitioner was not an expert and did not seek out expert advice regarding the economic aspects of running a profitable horse-breeding business. This factor weighs in favor of respondent's position.

3. Time and Effort Petitioner Expended in Carrying
   On the Activity

The fact that the taxpayer devotes much of her personal time and effort to carrying on an activity may indicate an intention to derive a profit, particularly if the activity does not have substantial personal or recreational aspects. Golanty v. Commissioner, 72 T.C. at 426; Sullivan v. Commissioner, T.C. Memo. 1998-367, affd. 202 F.3d 264 (5th Cir. 1999); Morley v. Commissioner, T.C. Memo. 1998-312;[11] sec. 1.183-2(b)(3), Income Tax Regs.

---

[11] Petitioner places heavy emphasis on Morley v. Commissioner, T.C. Memo. 1998-312, where the Court held that the taxpayer operated his horse activity for profit. Like petitioner, Mr. Morley worked 4 days a week in his dental practice and 7 days a week with his horse activity. However, the present case is readily distinguishable. Among other differences, Mr. Morley advertised, created promotional materials, and was not involved in the recreational components of horse ownership, specifically riding his horses, to any significant extent.

Petitioner often spent 6 hours a day with her horse activity. Petitioner argues that the activity does not have substantial personal or recreational aspects. Petitioner places heavy emphasis on the time spent feeding and watering her horses and cleaning stalls.

Petitioner asserts that her horse activity did not have any personal or recreational aspects. While the Court recognizes that feeding and watering her horses and cleaning stalls may not be enjoyable activities, unpleasant tasks associated with caring for horses are required regardless of whether the activity is pursued as a hobby or a business. See Sullivan v. Commissioner, supra. Petitioner has ridden and shown horses since she was a child. Though she does not ride in parades or attend social or charity functions, petitioner certainly derives some personal pleasure from riding and showing her horses. However, personal pleasure derived from an activity will not turn a business into a hobby. Jackson v. Commissioner, 59 T.C. 312, 317 (1972); see also McKeever v. Commissioner, T.C. Memo. 2000-288.

Petitioner spends a significant amount of time with her horse activity. Nevertheless, because the horse activity has significant personal and recreational components, this factor is neutral.

4.  Expectation That Assets Used in the Activity May
    Appreciate in Value

The expectation that assets used in the activity will

appreciate in value sufficiently to lead to an overall profit

when netted against losses may indicate a profit motive.

Engdahl v. Commissioner, 72 T.C. at 668-669; Lapinel v.

Commissioner, T.C. Memo. 1989-685, affd. 930 F.2d 911 (2d Cir.

1991); sec. 1.183-2(b)(4), Income Tax Regs.  Petitioner argues

that the appreciation of Falling Water Way and Gavilan Hills,

combined with the value of her horses, is significant enough to

offset all prior losses.

        a.    Falling Water Way and Gavilan Hills

Petitioner asserts that Falling Water Way and Gavilan Hills

are held in connection with her horse activity.  Respondent, on

the other hand, argues that her holding of real property is an

activity separate from petitioner's horse activity.  To make this

determination, section 1.183-1(d)(1), Income Tax Regs., states:

> all facts and circumstances * * * must be taken into
> account.  Generally, the most significant facts and
> circumstances in making this determination are the
> degree of organizational and economic interrelationship
> of various undertakings, the business purpose which is
> * * * served by carrying on the various undertakings
> separately or together * * * and the similarity of
> various undertakings. * * * The taxpayer's
> characterization will not be accepted * * * when it
> appears that his characterization is artificial and
> cannot be reasonably supported under the facts and
> circumstances of the case.  If the taxpayer engages in
> two or more separate activities, deductions and income
> from each separate activity are not aggregated either

in determining whether a particular activity is engaged in for profit or in applying section 183. * * *

Falling Water Way is at the center of petitioner's horse activity. Her horses are kept on the property and are bred, fed, and watered there. Petitioner testified that she trains her horses in the arena at Falling Water Way. However, Falling Water Way also includes petitioner's four-bedroom house and a garage unrelated to her horse activity. With the exception of the house and the garage, we conclude that Falling Water Way is a part of petitioner's horse activity. Therefore, any appreciation attributable to the horse facilities and land at Falling Water Way may be taken into consideration when determining whether petitioner engaged in her horse activity for a profit.

Gavilan Hills is approximately 5 miles from Falling Water Way. Even though petitioner has not made significant improvements to the property since 1991, petitioner used Gavilan Hills to exercise and train her horses throughout the years in issue. Gavilan Hills was not used for any purpose unrelated to petitioner's horse activity. We conclude that Gavilan Hills is a part of petitioner's horse activity. Therefore, any appreciation of Gavilan Hills may be taken into consideration when determining whether petitioner engaged in her horse activity for a profit.

b.  Petitioner's Horses

Petitioner's only evidence of the fair market value of her horses is based on the testimony of an expert witness, Janine Esler (Ms. Esler).  Ms. Esler is a professional horse trainer, breeder, bloodstock agent, and business consultant.  She has trained Arabian horses since 1975.  Her experience is sufficient to qualify her as an expert in the Arabian horse field.  However, we find that Ms. Esler's expert report does not provide reliable valuations of petitioner's horses.

Rule 143(f) states that a witness's expert report "shall state the * * * opinion and the facts * * * on which that opinion is based.  The report shall set forth in detail the reasons for the conclusion." (Emphasis added.)  In her report, Ms. Esler did not disclose her method of valuation.  At trial, she testified that she used "comparable values of horses", but she could not be more specific.  Ms. Esler further testified that a horse's pedigree, health condition, training history, and performance history are all factors to be considered in determining a horse's fair market value, yet these factors are not mentioned in her report.  In addition, Ms. Elser testified that it is important to view a horse from all angles and to watch the horse walking both towards and away from the observer.  However, Ms. Esler

never personally observed two of the horses valued in her report, TF Silent Reign and Mon Reve, instead relying on still-shot photographs.

We find that Ms. Esler's report does not comply with Rule 143(f), as it fails to set out in detail the reasons for her conclusions. We further find that Ms. Esler could not adequately explain her report at trial and her answers to many questions raise doubts as to the reliability of her valuations.

Because petitioner introduced no other evidence regarding the values of her horses, those values cannot be considered in determining whether petitioner engaged in her horse activity for profit.

c.  Summary

As outlined above, the fair market value of Falling Water Way and Gavilan Hills can be taken into account in considering this factor. Petitioner purchased Falling Water Way for $135,000 and Gavilan Hills for $70,000. As of June 15, 2004, the fair market value of the horse facilities and land at Falling Water Way was $375,000, and the fair market value of Gavilan Hills was $306,000. Falling Water Way and Gavilan Hills have appreciated substantially, and petitioner can reasonably expect the properties to continue to appreciate. Therefore, we find that this factor weighs in

favor of petitioner's position.  It is important to note, however, that "An unsuccessful horse-breeding operation cannot be carried on forever simply because the price of land in that general area is rising."  Lapinel v. Commissioner, T.C. Memo. 1989-685.

5.   Success of Petitioner in Carrying on Other Similar or Dissimilar Activities

The fact that the taxpayer has engaged in similar activities in the past and converted them to profitable enterprises may indicate that she engaged in the present activity for profit.  Lundquist v. Commissioner, T.C. Memo. 1999-83; De Mendoza v. Commissioner, T.C. Memo. 1994-314; sec. 1.183-2(b)(5), Income Tax Regs.  While petitioner has a long history of working with horses, she had not previously engaged in a horse-breeding business.  Petitioner runs a successful dental practice, but she presented no evidence that she operated her horse activity in a similarly businesslike manner.  See Dodge v. Commissioner, T.C. Memo. 1998-89.  Accordingly, this factor is neutral.

6.   Petitioners' History of Income or Losses With Respect to the Activity

A series of losses during the initial or startup stage of an activity may not necessarily be an indication that the activity is not engaged in for profit.  Engdahl v. Commissioner, 72 T.C. at 669; sec. 1.183-2(b)(6), Income Tax

Regs.  However, losses that extend beyond the customary startup stage may indicate that the activity is not engaged in for profit.  Engdahl v. Commissioner, supra at 669; sec. 1.183-2(b)(6), Income Tax Regs.

From 1988 through 2000, and 2002 through 2003, petitioner reported total Schedule C losses of $441,289.  In 2001, petitioner reported a $209 profit from her horse activity, due to the sale of Bogaz for $20,000.

Petitioner argues that the history of losses does not indicate she lacked a profit motive because her activity is in the startup stage.  This Court has recognized that the startup stage for a horse-breeding activity may be 5 to 10 years.  Engdahl v. Commissioner, supra at 669; McKeever v. Commissioner, T.C. Memo. 2000-288; Dodge v. Commissioner, supra.  Petitioner argues that her startup stage should be extended because she encountered unforseen circumstances, including the death of two foals in 1991 and 1998, respectively, and the depressed Arabian horse market in the mid-1990s.

The applicable regulations do not provide for an extension of the startup stage on account of unforeseen circumstances, and petitioner cites no caselaw to support her argument.  Instead, section 1.183-2(b)(6), Income Tax Regs., states:  "If losses are sustained because of

unforeseen or fortuitous circumstances which are beyond the control of the taxpayer * * * such losses would not be an indication that the activity is not engaged in for profit." Even if unforeseen circumstances beyond petitioner's control contributed to losses in earlier years, this does not explain petitioner's continued losses in 1999, 2000, 2002, and 2003, nor does it justify extending the long-recognized 5- to 10-year startup stage.

Petitioner began her horse activity in 1988. If we give her the full benefit of the recognized time period, the startup stage of petitioner's activity ended in 1997. In the 6 subsequent years, petitioner reported losses totaling $111,987, while reporting a profit in just 1 year of only $209.

Petitioner also argues that her history of losses does not indicate she lacked a profit motive because the losses were steadily declining until 2001, when a profit was achieved. From 1996 through 2000, petitioner's losses declined each year. In 1999 and 2000, petitioner reported losses of $22,777 and $17,649, respectively. In 2001, petitioner reported a profit of $209. However, in 2002 and 2003, petitioner reported losses of $27,072 and $23,421, respectively. In other words, petitioner's losses in 2002 and 2003 actually increased relative to her losses in 1999

and 2000.  Petitioner's losses after the years in issue only confirm the general pattern of losses.  See <u>Dodge v. Commissioner</u>, <u>supra</u>.  Given what has occurred since petitioner reported a profit in 2001, no positive inference can be made from the decline in losses before 2001.

Petitioner's history of losses indicates that her horse activity was not engaged in for profit.  This factor weighs heavily in favor of respondent's position.

7.  <u>The Amount of Occasional Profits, If Any, Which Are Earned</u>

The amount of profits in relation to the amount of losses incurred may provide a useful criterion in evaluating whether the taxpayer engaged in the activity for profit. <u>McKeever v. Commissioner</u>, <u>supra</u>; <u>Dodge v. Commissioner</u>, <u>supra</u>; sec. 1.183-2(b)(7), Income Tax Regs.  The regulations go on to state:

> <u>substantial profit</u>, though only occasional, would generally be indicative that an activity is engaged in for profit, where * * * <u>losses are comparatively small</u>. Moreover, an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated.

Sec. 1.183-2(b)(7), Income Tax Regs. (emphasis added).

Petitioner has not generated a "substantial" profit. In the 16 years petitioner has operated her horse activity, she reported a profit in 1 year of only $209, compared to

total losses of $441,289.  The size of her losses compared to only a small profit is not indicative of a profit motive.

Petitioner argues that she has the opportunity to earn a substantial ultimate profit through the sale of potentially valuable horses.  Petitioner introduced evidence that horses of the bloodlines she used in breeding Borissa have sold for $300,000, $150,000, $140,000, and $120,000.  Petitioner also testified that some purebred Arabian stallions have been syndicated for multimillion dollar values.  A taxpayer's belief that she could one day sell a horse for a substantial amount of revenue and a correspondingly large profit may be indicative of a profit motive if that belief is adequately supported.  See McKeever v. Commissioner, supra; Dawson v. Commissioner, T.C. Memo. 1996-417.  However, petitioner has never produced a horse of the caliber that would generate such substantial revenue.  Under the circumstances of this case, the possibility of a highly speculative profit is insufficient to outweigh the substantial losses and relatively minuscule gain over a 16-year period.  See McKeever v. Commissioner, supra.

This factor weighs in favor of respondent's position.

8.  The Financial Status of Petitioner

Substantial income from sources other than the activity may indicate that the taxpayer is not engaged in the

activity for profit, particularly if the losses generate substantial tax benefits. Engdahl v. Commissioner, supra at 669-670; sec. 1.183-2(b)(8), Income Tax Regs.

Petitioner is a dentist and runs her own dental practice as a professional corporation. From 1988 through 2003, petitioner received wage income from her professional corporation averaging $109,547 annually. In addition, since 1997, petitioner has reported average annual rental income of $7,871.

Despite her significant sources of current income, petitioner argues that her lack of investments and other resources on which to retire indicate that she is running her horse activity for profit. Petitioner testified that she is not the owner or beneficiary of any trusts, annuities, or pension plans, and her only investments consist of an individual retirement account worth less than $25,000 and stocks and bonds worth less than $20,000. Petitioner further testified that she intended her horse activity to be her source of retirement income.

In making this argument, petitioner disregards the value of her real property. As of June 15, 2004, the combined fair market value of Falling Water Way and Gavilan Hills was $836,000. The fair market value of the Rialto

property is not in the record.[12]  In addition, petitioner
disregards the value of her professional corporation, of
which she is the sole shareholder.

While the Court recognizes that, as long as tax rates
are less than 100 percent, there is no "benefit" to losing
money, see Engdahl v. Commissioner, 72 T.C. at 670,
deducting these losses significantly reduced the after-tax
cost of petitioner's horse activity, see Hillman v.
Commissioner, T.C. Memo. 1999-255; Sullivan v. Commissioner,
T.C. Memo. 1998-367.  Given the after-tax economics of
petitioner's activity, petitioner's significant annual wage
and rental income supports an inference that the activity
was not engaged in for profit.  This factor weighs in favor
of respondent's position.

9.   Elements of Personal Pleasure or Recreation

The presence of personal or recreational motives in
conducting an activity may indicate that the taxpayer is not
conducting the activity for profit.  McKeever v.
Commissioner, supra; sec. 1.183-2(b)(9), Income Tax Regs.
However, the fact that the taxpayer derives personal
pleasure from engaging in the activity does not show that
the taxpayer lacks a profit objective if the activity is, in

_____

[12]  Petitioner did not establish to what extent, if any,
these properties are encumbered.

fact, conducted for profit as evidenced by other factors. Sec. 1.183-2(b)(9), Income Tax Regs.

Despite petitioner's testimony that her horse activity did not have any personal or recreational aspects, petitioner certainly derives some personal pleasure from riding and showing her horses, as discussed above. However, this does not, by itself, indicate that petitioner lacked a profit motive. Accordingly, this factor is neutral.

Conclusion

Petitioner repeatedly testified that she intended to derive a profit from her horse activity and wished to use the activity as her source for retirement income. Petitioner's assertions, however, are not supported by the facts. In 16 years of operation, petitioner had 1 profitable year. Despite continual heavy losses, petitioner did not seek out expert advice, or attempt to educate herself, on the economic aspects of running a profitable horse-breeding business. Petitioner did not operate the activity in a businesslike manner. In addition, if not for her significant annual wage and rental income, petitioner would have been unable to continue the horse activity at a loss year after year. The only factor weighing in favor of petitioner, the appreciation of Falling Water Way and

Gavilan Hills, is not significant enough to overcome the other factors.

For these and all other reasons stated herein, we find that petitioner's horse activity was not engaged in for profit within the meaning of section 183. Therefore, respondent's determination that petitioner may not deduct losses from that activity is sustained.

B.   Accuracy-Related Penalty Under Section 6662

Respondent determined that petitioner is liable for accuracy-related penalties under section 6662(a) for 1999 and 2000.[13]  Section 6662(a) imposes a penalty in the amount of 20 percent on the portion of the underpayment to which the section applies.  As relevant to this case, the penalty applies to any portion of the underpayment that is attributable to any substantial understatement of income tax.  Sec. 6662(b)(2).  There is a "substantial understatement of income tax" if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the tax return or $5,000.  Sec. 6662(d)(1)

Section 7491(c) requires the Commissioner to carry the burden of production with regard to penalties.  Higbee v.

_____

[13]  As previously noted, respondent has conceded that petitioner is not liable for an accuracy-related penalty for 2001.

Commissioner, 116 T.C. 438, 446 (2001). Once the burden of production is met, the taxpayer must come forward with sufficient evidence that the penalty does not apply. Id. at 447.

The tax required to be shown on petitioner's tax returns was $26,378 and $19,845, for 1999 and 2000, respectively. Because 10 percent of the tax required to be shown is less than $5,000, petitioner's understatements are substantial if they exceed $5,000. Petitioner reported income tax liabilities of $19,261 and $14,375, resulting in understatements of $7,117 and $5,470 for 1999 and 2000, respectively. Respondent has satisfied his burden by showing that petitioner's understatements of tax, which exceeded $5,000, were substantial.

The accuracy-related penalty is not imposed, however, with respect to any portion of the understatement if the taxpayer can establish that she acted with reasonable cause and in good faith. Sec. 6664(c)(1). The decision as to whether the taxpayer acted with reasonable cause and in good faith depends upon all the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Circumstances indicating that a taxpayer acted with reasonable cause and in good faith include "an honest misunderstanding of fact or law that is reasonable in light

of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer."  Id.

Petitioner asserts that she acted with reasonable cause and in good faith, pointing out that:  (1) In 1994, petitioner was audited "on this same issue for the same business" and received a no-change letter; and (2) petitioner consulted with Mr. Wessman, a C.P.A., who prepared her Federal income tax returns for the years in issue.

While petitioner did receive a no-change letter with respect to her horse activity during 1991 and 1992, the audit focused on the passive activity rules of section 469. Because this case focuses on the hobby loss rules of section 183, the no-change letter received in 1994 cannot serve as a basis for reasonable cause.

Reliance upon the advice of an expert tax preparer may demonstrate that a taxpayer acted with reasonable cause and good faith in the context of section 6662(a).  Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991); see sec. 1.6664-4(c)(1), Income Tax Regs.  Petitioner provided Mr. Wessman with the annual profit and loss statements prepared by Ms. Pope.  Respondent has conceded that these statements were adequate to substantiate all of petitioner's claimed

expenses for the years in issue. Mr. Wessman's testimony that petitioner provided him with all the necessary information is bolstered by respondent's concession. Mr. Wessman further testified that he believed petitioner's returns were correct as filed. Petitioner credibly testified that she relied on Mr. Wessman in determining the tax treatment of her horse activity.

Petitioner did not produce any books, records, or other work papers in response to respondent's initial contact letter. Additionally, petitioner did not agree to extend the period of limitations or participate in the appeal process. However, Mr. Wessman credibly testified that such actions were taken in order to expedite the review process so that the years in issue could be consolidated with the prior Tax Court case. Given the circumstances, we find petitioner did not act in bad faith.

We conclude that petitioner acted with reasonable cause and in good faith. Accordingly, we hold that petitioner is not liable for the accuracy-related penalties under section 6662(a).

In reaching our holdings, we have considered all arguments and contentions made, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing and the concessions of the parties,

Decision will be

entered under Rule 155.
