T.C. Memo. 2007-340

UNITED STATES TAX COURT

DENNIS L. AND MARGARET J. KNUDSEN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18246-04.                Filed November 15, 2007.

<u>Jack D. Flesher</u> and <u>Brian A. Turney</u>, for petitioners.

<u>Ann L. Darnold</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  Respondent determined deficiencies with
respect to petitioners' Federal income tax of $183,774 for 2000
and $197,473 for 2001.  The issues for decision are:

(1) Whether petitioners' exotic animal breeding activity for 2000 and 2001 constituted an activity engaged in for profit within the meaning of section 183;[1] and

(2) if petitioners were engaged in an activity for profit, whether certain amounts claimed as deductions for 2000 and 2001 should be either disallowed for lack of substantiation or reclassified as capital expenditures.

FINDINGS OF FACT

The parties have stipulated some of the facts, which we incorporate in our findings by this reference. Petitioners resided in Liberal, Kansas, when the petition was filed.

Petitioners

At all relevant times, Dennis L. Knudsen (Dr. Knudsen) was a medical doctor, specializing in obstetrics/gynecology. Dr. Knudsen spent his spare time working in petitioners' exotic animal breeding operation called El Rancho Exotica (ERE).

Margaret J. Knudsen (Mrs. Knudsen) was the primary operator and manager of ERE. Mrs. Knudsen also helped part time in Dr. Knudsen's medical practice. Mrs. Knudsen completed 32 hours of business courses in college but does not hold a business degree.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

She has never received any formal training in animal care or zoo science.

Commencement of the Breeding Activity

In 1989, petitioners began breeding birds. Petitioners did not have any employment history or business experience in breeding or selling animals.[2] Petitioners did not have a formal business plan, nor did they prepare any economic projections for their animal breeding operation.[3]

Dr. Knudsen became interested in breeding birds after learning that the United States had concluded treaties banning the importation of tropical birds. Because of the ban on importation, petitioners anticipated favorable market conditions for tropical birds. Petitioners hoped the bird breeding business would be a source of income after Dr. Knudsen retired from his medical practice.

Before acquiring any birds for breeding, Dr. Knudsen learned about an evolving practice of hand feeding parrots. According to the information he acquired, hand feeding the parrots made them more marketable as pets. Petitioners attended a bird breeding seminar in California on hand feeding and raising young parrots.

---

[2]Dr. Knudsen testified that he had some limited experience in the breeding of small birds. The record does not reflect whether Dr. Knudsen ever sold any of these birds.

[3]Dr. Knudsen testified that he was "very interested" in bird breeding, and "Whether or not it was economically feasible, * * * only time would tell."

Petitioners also began collecting books about bird breeding. Dr. Knudsen also read several publications, including Bird Talk magazine, about bird breeding.

Petitioners did not present any evidence that they consulted with a paid adviser about the operation or economics of a bird breeding business. Petitioners, however, did consult with several bird enthusiasts about bird breeding. In the mid-1980s, petitioners met a well-known bird breeder, Richard Shubot (Mr. Shubot), who was involved in bird conservation. Petitioners visited Mr. Shubot in Florida and spoke with him about his experiences with bird breeding. Mr. Shubot talked with petitioners about bird diets, temperature, and timing of eggs. Dr. Knudsen and Mr. Shubot kept in touch monthly for several years. In addition, Dr. Knudsen visited Dick Schroeder (Mr. Schroeder), a bird breeder, at his facility in California. Dr. Knudsen and Mr. Schroeder talked about setting up bird cages and pairing birds in cages. Dr. Knudsen occasionally talked to Gail Worth, head of the editorial board of Bird Talk magazine, about setting up his bird breeding operation. Dr. Knudsen also contacted a breeder in Minnesota about housing birds in an indoor facility with artificial light.

After purchasing a large tract of land for bird breeding, petitioners decided to expand their breeding activities to other animals. In 1992, petitioners began purchasing camels and

llamas.  Petitioners became interested in llamas because they helped eliminate sage and weeds, and they deterred coyotes by emitting a scent.  Further, petitioners learned that llamas reduced stress in humans, and they experimented with the use of llamas in Dr. Knudsen's medical practice.

Before acquiring camels and llamas, petitioners visited several llama ranches, spoke with breeders over the telephone, and joined a local llama society.  Petitioners also visited several breeders, including a llama breeder in Texas and a camel breeder in Colorado.  In addition, Dr. Knudsen read books about camel breeding in the Middle East.  Petitioners expected to recoup the expense of breeding the camels over approximately 10 years.

After purchasing camels and llamas, petitioners became interested in breeding Angora goats because the U.S. Government subsidized Angora goat wool.  However, the United States phased out the subsidy shortly after petitioners acquired their Angora goats.

Petitioners continued to acquire more species of animals to breed, including, but not limited to, Watusi cattle, miniature donkeys, miniature horses, elk, reindeer, zebras, African antelope, kangaroos, Clydesdale horses, and primates.

Petitioners' Operational History

From 1989 through 2001, petitioners acquired around 50 or 60 species of birds and approximately 30 different species of other animals for breeding.  From 1989 through 2001, petitioners spent more than $1 million on livestock.[4]

Petitioners purchased animals from dealer/brokers and zoos. Before purchasing an animal, petitioners often did not investigate the quality and breeding possibility of the animal. Mrs. Knudsen purchased two Clydesdale horses without knowing what the selling price of their offspring would be.  She also purchased breeds that were not suitable for the Kansas climate. In addition, Mrs. Knudsen purchased animals without receiving any health information on them.  For example, petitioners purchased from a zoo a bongo that had an implant, which prevented the animal from breeding.

Petitioners hired employees to help maintain the facilities. Two of petitioners' children also helped at ERE, although they did not always receive wages.  Petitioners offered their full-time employees health insurance benefits.  Petitioners withheld employment taxes and filed payroll tax returns with the Internal Revenue Service and the State of Kansas.  Petitioners required

---

[4]During the years at issue, petitioners spent $97,797 on livestock purchases.

their employees to clock in and out of work, and they maintained an employee training manual.

Employees mowed the grass, painted, and performed other upkeep at ERE. The employees generally did not help Mrs. Knudsen care for the animals. However, Mrs. Knudsen allowed one employee at a time to assist her in caring for the birds. Mrs. Knudsen typically trained each of these employees for approximately 2 weeks.

During the years in issue, insurance for their animals was available to petitioners. However, petitioners did not insure their animals because it was too costly.

Mrs. Knudsen acquired the following licenses on behalf of ERE: Captive-Bred Wildlife Registration--U.S. Department of Interior, Fish and Wildlife Service; Federal Fish and Wildlife Permit; Class B Dealer Permit Under the Animal Welfare Act--U.S. Department of Agriculture (USDA); Federal Fish and Wildlife Permit--Migratory Birds; Kansas Department of Wildlife and Parks Game Breeders Permit; Nursery Dealer License--Kansas Department of Agriculture; Kansas Rehabilitation Permit. Several of these licenses were required for petitioners to deal in certain animals.

In addition to the licenses held by ERE, Mrs. Knudsen joined the following organizations: International Society of Zooculturalists (ISZ), Exotic Wildlife Association (EWA), United

Zoological Association, Clydesdale Breeders of the United States, American Miniature Donkey Registry, American Miniature Horse Association, North American Elk Breeders Association, International Lama Registry, World Watusi Association, American Quarter Horse Association, Reindeer Owners and Breeders Association, American Federation of Agriculture, American Pheasant and Waterfowl Society, and Ducks Unlimited.

During the operation of ERE, petitioners experienced several setbacks in their breeding activity, including:

! Petitioners lost many bird eggs and chicks after an employee brought her young child into the bird breeding facility.

! Wind storms caused eye problems for the Rocky Mountain goats, which affected their breeding.

! A drought in Kansas negatively affected the breeding of many animals.

! A very expensive bird escaped after an employee left the bird cage open.

! A heater failed on a very cold night, resulting in the deaths of two bongos.

! Two Clydesdale horses died in a barn fire.

! Several gemsbok crashed into a fence during the barn fire, and one of them was killed. Several others lost market value after breaking their horns.

! A coyote killed a Black Buck antelope.

! A mountain lion killed an East African crowned crane and its chick.

! A male addax died during a windstorm.

! A giraffe died after slipping on wet ground.

! A giraffe calf died as a result of the cold weather on the night of its birth.

Mrs. Knudsen testified that petitioners would eliminate breeding groups that were unsuccessful and expand breeding groups that were successful. However, petitioners did not base any decision on an analysis of the profitability of a breeding line.[5] Petitioners eliminated a breeding group, for example, if a mother lost her young or did not take care of it. They also eliminated animals that required continuous bottle feedings.

Petitioners' Breeding Facilities

Petitioners tried several locations for their bird breeding activity. During the first year of breeding, petitioners kept the birds in a sunroom inside their home. After acquiring more birds, petitioners decided to build cages for the birds in a heated building. However, the cages were unsatisfactory. Petitioners then decided to construct a small metal building

---

[5]Petitioners did not keep complete breeding records that would have enabled them to make an economic analysis of each breed.

behind Dr. Knudsen's medical office building.  The birds remained in this building for about 3 years.

As their bird breeding activity expanded, petitioners decided to purchase a 160-acre tract located about 10 miles north of Liberal, Kansas.  At that time, petitioners named their operation ERE.

Before constructing any facilities on the land, petitioners attended seminars where they learned about suitable environments for housing the birds.  In the early 1990s, petitioners constructed two buildings, an indoor-only building and an indoor/outdoor building.

Over time, petitioners made additional improvements at ERE. Petitioners built a rain forest structure, an aviary, camel and goat sheds, a llama breeding barn, a giraffe building, a chimpanzee building, a monkey cage, a gazebo, multiple fences, approximately 12 Morton buildings,[6] and numerous other metal buildings.  In addition, petitioners kept two mobile homes on the property.  Petitioners also made substantial improvements to the landscape of ERE by planting trees and shrubs and installing sidewalks, driveways, rocks, a pond, and a deck.  From 1990 through 2001, petitioners spent a total of $1,532,252 on

---

[6]Morton buildings are steel buildings that can withstand strong winds and volatile weather.

improvements to the land.[7]  In addition, petitioners spent $261,348 on equipment used to maintain the property.

The USDA conducted two annual inspections of ERE's facilities.  The USDA requires that exotic animal breeding facilities be constructed and maintained according to USDA regulations.[8]  To comply with USDA's requirements, petitioners incurred large expenses installing infrastructure on the property.  For example, petitioners constructed metal and concrete buildings, maintained heat inside the buildings, and built walkways throughout the property.  During the years at issue, ERE was in compliance with or received variances from all USDA requirements.[9]

In 2000, petitioners started building a home on the property.  Petitioners decided to live on the property because Mrs. Knudsen often drove to the property alone at night to feed the animals, and petitioners wanted to keep better watch over

---

[7]The improvements to the land consisted of $1,119,478 for buildings and $412,774 for landscaping.

[8]The USDA regulates the following:  Housing, ventilation, lighting, interior surfaces, primary enclosures, sanitation, pest control, feeding and watering, outdoor shelter, compatibility of animals housed together, record keeping, adequate veterinary care, handling, and transportation.

[9]In 2001, the USDA informed petitioners that they were not in compliance with a new USDA regulation.  The new regulation required an 8-foot perimeter fence for potentially dangerous animals.  Mrs. Knudsen applied for a variance from the new regulation, and the USDA granted Mrs. Knudsen's request because the existing structures were sufficient.

ERE. In addition, petitioners installed a swimming pool with a sun room enclosure at their new home.

Petitioners' Record Keeping

Petitioners maintained financial and accounting records as well as operational records for ERE. Petitioners kept ERE's bank account and accounting records separate from their personal financial records.[10] An employee/bookkeeper of Dr. Knudsen's medical practice maintained ERE's books of account using Quickbooks accounting software[11] and was responsible for paying all of ERE's expenses, including taxes. Petitioners maintained a general ledger, cash receipts/disbursements journals, and financial statements for ERE. The record does not contain any evidence, however, that petitioners used their financial records for making business decisions.

Petitioners hired James W. Grimes (Mr. Grimes), a certified public accountant of Hay, Rice & Associates, to prepare ERE's income tax returns. Although Mr. Grimes's accounting firm offers business consulting to clients, petitioners did not introduce any evidence that Mr. Grimes, or any person from his firm, advised petitioners about business plans or ways to achieve profitability.

_____

[10]In 2000, over $300,000 of deposits into the bank account of ERE were cash from Dr. Knudsen's medical practice.

[11]The employee also kept the books for petitioners' personal accounts.

Petitioners kept a depreciation schedule for the animals purchased for breeding and the improvements made on the land. However, Mrs. Knudsen admitted that the depreciation schedule contained errors. For example, Mrs. Knudsen testified that petitioners owned two blue and gold macaws, but only one was included on the depreciation schedule.

In addition to their accounting records, petitioners kept some operational records for their breeding activity. Mrs. Knudsen maintained a daily journal, a calendar of bird breeding activity, and a large notebook of breeding records. The daily journal was a calendar that was kept near the entrance of the building, on which employees documented daily events such as weather temperatures, births, deaths, workers present, chores of the day, and deliveries of feed and fuel. The bird calendar was kept in petitioners' kitchen and included information on the bird breeding activity. The bird calendar helped petitioners determine when the birds would lay eggs and when the eggs would hatch.

The large notebook of breeding records contained information such as names of sellers, dates of purchase, purchase prices, and breeding information. The breeding records did not identify the species of animal, and many of the breeding records were incomplete. Petitioners did not maintain breeding records for all of their animals. For example, petitioners did not keep

breeding records for the birds or the primates. Several animals had births during 2000 and 2001 for which petitioners did not provide breeding records.[12]

Mrs. Knudsen testified that she periodically transferred information on animal births and deaths from the journals and the bird calendar to computerized breeding records. However, the computer records introduced in evidence were incomplete and covered 2000 and 2001 only.

Petitioners kept other operational records. For animals born and raised at ERE, Mrs. Knudsen kept pediatric records detailing each animal's birth date, birth weight, and medications given at birth. The pediatric records also tracked feeding. Mrs. Knudsen also kept a record of microchip implantations,[13] but this record was incomplete.

Petitioners did not regularly maintain a complete inventory of ERE's animals. They compiled a list only once a year for the USDA's annual inspection. At the time of trial, petitioners did not know and could not estimate the fair market value of ERE's animals.

---

[12]Breeding records were unavailable for many animals, including: Aoudads, Watusi cattle, muntjac, Pere David's deer, chamois, sloths, coatis, kangaroos, caribous, and Black Bucks.

[13]The microchips were useful for recovering stolen animals.

Moreover, petitioners did not issue invoices or receipts to customers.[14]  A customer's only proof of purchase from ERE was a notation of the species on the canceled check.  Although Mrs. Knudsen testified that petitioners kept a record of animal sales on Quickbooks, the record provides almost no details regarding petitioners' animal sales.

Petitioners' Marketing Activities

Petitioners conducted very little marketing and advertising for ERE.  Petitioners reported advertising expenses during only 1 year of operation.[15]  Mrs. Knudsen was unable to explain why petitioners claimed advertising expenses in only 1 year.  She testified that petitioners had advertising expenses in 2000 or 2001, but the record does not indicate that petitioners paid for advertising in those years.

Petitioners publicized their animals in trade journals and through animal breeding organizations.  For example, Mrs. Knudsen listed ERE in the ISZ breeders' directory, and she made contacts in the exotic animal business through membership in EWA and by attending auctions.  Although Mrs. Knudsen testified that she belongs to these organizations to help her establish a good reputation in the exotic animal business, petitioners did not

---

[14]Petitioners issued a receipt to only one buyer.

[15]In 1996, petitioners reported $4,030 in advertising expenses on their Federal income tax return.

present evidence that membership in these organizations increased the marketability of their animals.

In addition, Mrs. Knudsen ordered business cards for ERE and distributed them to potential business contacts. ERE's business card featured a description of its business as "conservation, preservation, rare and endangered species", a small picture of exotic animals, and Mrs. Knudsen's name and contact information. The business card did not indicate that ERE sold exotic animals.

Petitioners' Sales Activities

Petitioners sold animals to individuals, brokers, and zoos and through auctions. Petitioners initially sold birds locally but then decided to use a broker to send most of their birds to a pet shop in Denver. Petitioners determined the market prices for their animals from various journals, including Animal Finders' Guide and Rare Breeds Journal.

From 1995 through 2002, petitioners received $416,080 from animal sales. As stated above, the record provides little evidence regarding the details of petitioners' sales activities.

Petitioners' Time and Effort

Petitioners devoted substantial time and effort to ERE. Although Dr. Knudsen devoted most of his time to his medical practice, he spent around 15 or 20 hours per week working at ERE during the spring and summer months. Dr. Knudsen attended to the animals' health needs and was the primary caretaker of the

landscaping at ERE.  He testified that the landscaping created a natural environment for the animals to thrive.

Mrs. Knudsen was the primary operator of ERE and devoted a significant amount of time to it.  Mrs. Knudsen also helped in Dr. Knudsen's medical practice and received wages for her services.  At one time, petitioners employed a manager of ERE to help Mrs. Knudsen with the daily activities.  After the manager left around 2000, Mrs. Knudsen assumed all responsibilities for the daily management of ERE.

Many of Mrs. Knudsen's duties were demanding.  She hand or bottle fed baby animals several times a day.  Mrs. Knudsen fed the primates and kangaroos every day and spent about 45 minutes a day feeding the birds in the breeder building.  In addition, she fed the kangaroos and the giraffe fresh fruit and produce three times a week.  During the winter, Mrs. Knudsen acclimated the primates to the cold weather by letting them out during the day and locking them up at night.

Mrs. Knudsen's work at ERE was not always pleasurable.  She performed tasks such as cleaning stalls and cages, checking the heaters in the middle of a blizzard, hand feeding the birds grub worms, and disposing of animal carcasses.  As a result of her duties at ERE, Mrs. Knudsen sustained several injuries.  In 1999, she received a permanent scar on her left temple because of a bird attack.  In 2000, Mrs. Knudsen had surgery on her right

shoulder to repair damage caused by stacking hay and cleaning stalls. In 2001, she had surgery on a knee injury resulting from a chimpanzee attack.

In addition to her duties at ERE, Mrs. Knudsen spent time attending seminars on various animals. At one seminar, Mrs. Knudsen learned how to implant microchips in the animals. Petitioners attended seminars on hand feeding birds and on constructing bird breeding facilities. Mrs. Knudsen also dedicated a significant amount of time to her various membership organizations. She spoke at an ISZ-sponsored seminar at the Omaha Zoo and in 2000 hosted the ISZ convention.

Petitioners' Income Tax Returns

Most of petitioners' breeding activity losses resulted from depreciation of the animals, infrastructure, and improvements. On Schedules F, Profit or Loss From Farming, of their returns, petitioners reported gross income and expenses and net profit or loss for 1995 through 2002 relating to ERE, as shown in the following table:

| Year | Gross income | Expenses | Net profit or (loss) |
|------|--------------|----------|----------------------|
| 1995 | $22,138 | $376,943 | ($354,805) |
| 1996 | 49,011 | 342,794 | (293,783) |
| 1997 | 23,528 | 365,544 | (342,016) |
| 1998 | 69,639 | 355,230 | (285,591) |
| 1999 | 59,353 | 412,127 | (352,774) |
| 2000 | 50,423 | 481,386 | (430,963) |
| 2001 | 63,977 | 534,483 | (470,506) |
| 2002 | 104,671 | 436,478 | (331,807) |

The following table compares the adjusted gross income (AGI) that petitioners would have reported if they had not engaged in their breeding activity with the AGI that they actually reported on their Federal income tax returns for 1995 through 2002:

| Year | AGI without ERE | AGI reported |
|------|-----------------|--------------|
| 1995 | $553,075 | $199,175 |
| 1996 | 716,359 | 428,485 |
| 1997 | 748,293 | 409,896 |
| 1998 | 688,703 | 413,584 |
| 1999 | 781,242 | 440,399 |
| 2000 | 1,003,786 | 586,239 |
| 2001 | 1,072,126 | 613,985 |
| 2002 | 886,312 | 555,856 |

The losses from ERE allowed petitioners to reduce their Federal income tax liability by $170,732 for 2000 and $184,507 for 2001.

Notice of Deficiency

Following an examination of petitioners' Federal income tax returns for 2000 and 2001, respondent issued a notice of deficiency in which he determined: (1) Petitioners' animal breeding activity in those years was an activity not engaged in for profit under section 183, and expense deductions claimed with respect to the breeding activity were disallowed, except as allowed by section 183(b), and (2) computational adjustments to petitioners' itemized deductions were required because of the preceding adjustments.

OPINION

I.  Burden of Proof

Petitioners argue that the burden of proof should be shifted to respondent under section 7491(a) because petitioners produced credible evidence and satisfied the requirements of section 7491(a)(2).

Generally, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous.  Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Section 7491 is applicable to court proceedings arising in connection with examinations commenced after July 22, 1998.  Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727.  Under section 7491(a)(1), the burden of proof shifts to the Commissioner, subject to certain limitations, where a taxpayer introduces credible evidence with respect to a factual issue relevant to ascertaining the taxpayer's tax liability if the taxpayer introduces credible evidence regarding the issue.  See Ashley v. Commissioner, T.C. Memo. 2000-376.  Section 7491(a)(1) applies with respect to a factual issue only if the requirements of section 7491(a)(2) are satisfied.  Section 7491(a)(2) requires that a taxpayer have maintained all records required by the Internal Revenue Code, cooperated with reasonable requests by the Secretary for witnesses, information, documents,

meetings, and interviews, and, if the taxpayer is a corporation, satisfied the net worth requirements of section 7430(c)(4)(A)(ii).

Respondent admits that petitioners have cooperated throughout the examination. However, respondent argues that petitioners have not provided substantiation for certain Schedule F expense deductions and that petitioners have not produced credible evidence with respect to whether their exotic animal breeding operation was an activity engaged in for profit.

We do not need to decide whether petitioners have met all of the requirements under section 7491 to shift the burden of proof to respondent. The outcome of this case is based on a preponderance of the evidence and thus is unaffected by section 7491. See Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005) (citing Blodgett v. Commissioner, 394 F.3d 1030, 1035 (8th Cir. 2005), affg. T.C. Memo. 2003-212, and Estate of Stone v. Commissioner, T.C. Memo. 2003-309).

II. Section 183(a) Deductions

A. In General

Section 183(a) provides that if an activity is not engaged in for profit, no deduction attributable to the activity shall be allowed except as provided in section 183(b). Section 183(b)(1) authorizes a deduction for any expense that otherwise is allowable, regardless of profit objective. Section 183(b)(2)

authorizes a deduction for expenses that would be allowable if the activity were engaged in for profit, but only to the extent that gross income attributable to the activity exceeds the deductions permitted by section 183(b)(1). Section 183(c) defines "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

Section 162 authorizes a deduction for the expenses of carrying on an activity that constitutes a trade or business of the taxpayer. See sec. 162(a); sec. 1.183-2(a), Income Tax Regs. To be engaged in a trade or business with respect to which deductions are allowable under section 162, "the taxpayer must be involved in the activity with continuity and regularity", and "the taxpayer's primary purpose for engaging in the activity must be for income or profit." Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); see also Warden v. Commissioner, T.C. Memo. 1995-176, affd. without published opinion 111 F.3d 139 (9th Cir. 1997).

Absent a stipulation to the contrary, see sec. 7482(b)(2), this case is appealable to the Court of Appeals for the Tenth Circuit, which has applied the dominant or primary objective standard to test whether an alleged business activity is conducted for profit. Hildebrand v. Commissioner, 28 F.3d 1024,

1027 (10th Cir. 1994), affg. Krause v. Commissioner, 99 T.C. 132 (1992); Cannon v. Commissioner, 949 F.2d 345, 350 (10th Cir. 1991), affg. T.C. Memo. 1990-148;[16] Oswandel v. Commissioner, T.C. Memo. 2007-183. Under the standard applied by the Court of Appeals for the Tenth Circuit, petitioners must prove that the dominant or primary objective of their exotic animal breeding activity was to earn a profit.

Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of factors to be considered in determining whether a taxpayer has the requisite profit objective. The factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9)

---

[16]In both Hildebrand v. Commissioner, 28 F.2d 1024, 1027 (10th Cir. 1994), affg. Krause v. Commissioner, 99 T.C. 132 (1992), and Cannon v. Commissioner, 949 F.2d 345, 350 (10th Cir. 1991), affg. T.C. Memo. 1990-148, the Court of Appeals for the Tenth Circuit applied the dominant or primary objective test at the partnership level in analyzing whether a partnership was engaged in an activity for profit under sec. 183.

elements of personal pleasure or recreation.  No single factor is determinative, and not all factors are applicable in every case. See Allen v. Commissioner, 72 T.C. 28, 34 (1979); sec. 1.183-2(b), Income Tax Regs.

In making our evaluation of the foregoing factors, we may consider evidence from years subsequent to the years in issue "to the extent it may create inferences regarding the existence of a profit motive in the earlier years."  Hillman v. Commissioner, T.C. Memo. 1999-255 (citing Hoyle v. Commissioner, T.C. Memo. 1994-592).  "[A]ctual profits or losses in those and subsequent years have probative, although not determinative, significance in such evaluation."  Smith v. Commissioner, T.C. Memo. 1993-140.

B.    Applying the Factors

1.    The Manner in Which Petitioners Conducted the Activity

In deciding whether a taxpayer has conducted an activity in a businesslike manner, we consider whether complete and accurate books and records were maintained, whether the activity was conducted in a manner substantially similar to other activities of the same nature that were profitable, and whether changes in operating methods, adoption of new techniques, or abandonment of unprofitable methods was done in a manner consistent with an intent to improve profitability.  See Engdahl v. Commissioner, 72 T.C. 659, 666-667 (1979); sec. 1.183-2(b)(1), Income Tax Regs.

a. Petitioners' Record Keeping

Petitioners' bookkeeper maintained books and records for ERE using Quickbooks software. The software produced financial reports, including a general ledger. Petitioners kept ERE's records separate from Dr. Knudsen's medical practice records and petitioners' personal records. Petitioners also maintained a separate bank account for ERE.

Although we are satisfied that petitioners kept financial records of their breeding activity, we are not convinced that petitioners' record keeping represented anything other than an effort to substantiate expenses claimed on their return. As we have held:

> The purpose of maintaining books and records is more than to memorialize for tax purposes the existence of the subject transactions; it is to facilitate a means of periodically determining profitability and analyzing expenses such that proper cost saving measures might be implemented in a timely and efficient manner. * * * [Burger v. Commissioner, T.C. Memo. 1985-523 (citing Golanty v. Commissioner, 72 T.C. 411, 430 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981)), affd. 809 F.2d 355 (7th Cir. 1987).]

Petitioners presented no evidence that their books and records were used to review profitability or to implement cost-saving measures.

While a taxpayer need not maintain a sophisticated cost accounting system, the taxpayer should keep records that enable the taxpayer to make informed business decisions. See Burger v.

Commissioner, 809 F.2d at 359. For a taxpayer's books and records to indicate a profit motive, the books and records should enable a taxpayer to cut expenses, increase profits, and evaluate the overall performance of the operation. See Abbene v. Commissioner, T.C. Memo. 1998-330.

Although petitioners kept extensive financial records, they were not used to review and reduce expenses or to enhance the possibility of generating income. For example, Mrs. Knudsen testified that a decision regarding termination of a breeding line was made by considering whether an animal was producing young and taking care of them. Petitioners did not introduce any evidence that they used their financial and breeding records to determine whether a specific breed was profitable. Further, petitioners did not maintain records of revenues and expenses associated with each animal or breed. See, e.g., Steele v. Commissioner, T.C. Memo. 1983-63 (failure to keep track of expenses for each animal implies lack of profit motive). Because petitioners failed to use the existing books and records to minimize their expenses or otherwise foster profitability, the fact that they maintained records does not indicate that the activity was carried on with a profit motive. See Sullivan v. Commissioner, T.C. Memo. 1998-367 (maintenance of records generally not indicative of profit motive where evidence did not

show taxpayer used records to improve losing venture), affd. without published opinion 202 F.3d 264 (5th Cir. 1999).

Petitioners did not prove that their books and records were kept or used in a businesslike manner. In addition, petitioners did not maintain ERE's operational records in a businesslike manner. Petitioners could not make meaningful decisions regarding their breeding activities from the incomplete operational records they maintained.

### b. Similarity to Other Activities of the Same Nature

Petitioners argue that the breeding of each species should be evaluated as a separate activity. They claim that each breeding activity was conducted in a similar manner to successful breeding activities. However, petitioners did not introduce credible evidence of which species were successfully bred and how successful breeding activities were conducted. See Wesinger v. Commissioner, T.C. Memo. 1999-372; Filios v. Commissioner, T.C. Memo. 1999-92, affd. 224 F.3d 16 (1st Cir. 2000); sec. 1.183-2(c), Example (4), Income Tax Regs. Thus, we are not in a position to evaluate whether petitioners' exotic animal breeding activity was conducted in a manner substantially similar to that of other profitable animal breeding operations.

### c. Changes Made To Foster Profitability

Petitioners argue that several changes in operating methods support their claim of a businesslike operation. First,

petitioners claim that they eliminated unprofitable breeding groups and expanded profitable breeding groups. Second, petitioners contend that they minimized the expenses of ERE by performing necessary duties themselves. For example, Mrs. Knudsen learned to perform microchip implantation, and Dr. Knudsen landscaped the property and attended to the animals' health needs. Finally, petitioners argue that they decreased expenses by rotating the grazing pastures to reduce the amount of hay purchased, by purchasing animals that could be housed in the existing facilities, and by purchasing feed in bulk.

Petitioners have not convinced us that the changes had a material impact on ERE's profitability. See Golanty v. Commissioner, supra at 428 (changes must be sufficient to alter materially the prospects of making a profit). The amounts of petitioners' losses did not decline despite petitioners' claims that they cut costs and eliminated unprofitable breeding groups. Petitioners' greatest losses were during 2000 and 2001, more than 10 years after starting their breeding activity. Further, petitioners did not expand or eliminate any breeding lines using an economic analysis of the individual breeds.

Finally, we note that petitioners' marketing and sales efforts have changed little since the inception of the activity. Relatively little has been spent on advertising. Cf. Burrow v. Commissioner, T.C. Memo. 1990-621. In fact, petitioners incurred

advertising expenses during only 1 year of operation. Despite substantial losses each year, petitioners did not step up advertising efforts to increase revenue from animal sales.

d. Summary

Under the facts and circumstances of this case, petitioners did not conduct their exotic animal breeding activity in a businesslike manner.

This factor favors respondent's position.

2. The Expertise of Petitioners or Their Advisers

Preparation for an activity by extensive study of its accepted business, economic, and scientific practices or consultation with industry experts may indicate a profit motive where the taxpayer carries on the activity in accordance with such practices. See sec. 1.183-2(b)(2), Income Tax Regs. A taxpayer's efforts to gain experience and to follow expert advice may indicate a profit motive. See, e.g., Dworshak v. Commissioner, T.C. Memo. 2004-249.

Petitioners learned about exotic animal breeding by attending seminars and conferences, reading books and scientific journals, and consulting experienced breeders. However, petitioners did not present evidence that any of the experts they contacted were experts in the economics of the exotic animal breeding business or were successful in running such a business. In addition, petitioners offered no evidence that the seminars

and conferences instructed them on how to run a successful animal breeding business.  Petitioners did not consult a business adviser, prepare budgets, or implement a business plan. Petitioners may have become well educated in exotic animal breeding, but they did not establish an acquired expertise in operating a profitable animal breeding business.

On several occasions, petitioners failed to investigate the profitability of a breed before purchasing an animal.  Mrs. Knudsen purchased two Clydesdale horses without knowing what the selling price of their offspring would be, and she purchased other animal breeds that were unfit for the Kansas climate.  In addition, Mrs. Knudsen purchased animals without receiving any health information on them.

On balance, we conclude that petitioners did not have, and did not acquire from others, expertise in the economics of the exotic animal breeding business.

This factor favors respondent's position.

### 3. Petitioners' Time and Effort Devoted to the Activity

The fact that a taxpayer devotes personal time and effort to carry on an activity may indicate an intention to derive a profit, particularly where there are no substantial personal or recreational elements associated with the activity.  See Daley v. Commissioner, T.C. Memo. 1996-259; sec. 1.183-2(b)(3), Income Tax Regs.  A taxpayer's withdrawal from another occupation to devote

most of his energies to the activity may be evidence that the activity was engaged in for profit.  See sec. 1.183-2(b)(3), Income Tax Regs.

Respondent does not dispute that Mrs. Knudsen devoted a substantial amount of time and effort to petitioners' exotic animal breeding activity.  However, respondent argues that Mrs. Knudsen gained personal satisfaction from spending time with the animals, and thus, the significant amount of time and effort she spent with them does not evidence a profit objective.

Although Mrs. Knudsen gained enjoyment from her animals, many of her duties were not personal or recreational.  For example, Mrs. Knudsen cleaned stalls and cages, disposed of animal waste and carcasses, and cared for animals during the night.  The fact that a taxpayer derives some personal satisfaction from a business does not turn it into a hobby. Jackson v. Commissioner, 59 T.C. 312, 317 (1972); Giles v. Commissioner, T.C. Memo. 2006-15; McKeever v. Commissioner, T.C. Memo. 2000-288.

Mrs. Knudsen operated and managed ERE.[17]  Although she worked part time in Dr. Knudsen's medical practice, Mrs. Knudsen devoted substantial amounts of her time to ERE.  In addition to Mrs. Knudsen's labor, ERE hired several employees to help maintain the

---

[17]During a brief period, ERE hired a manager to help Mrs. Knudsen manage ERE.

breeding operation. Petitioners employed two full-time workers at ERE and hired additional employees during the summer to help with the upkeep of the facilities. Because of the sensitive nature of the birds, Mrs. Knudsen was their primary caretaker. Generally, Mrs. Knudsen trained only one employee to help handle and feed the birds. ERE also used a bookkeeper to maintain ERE's accounting records, but Mrs. Knudsen was responsible for keeping ERE's operational records.

Along with her duties at ERE, Mrs. Knudsen devoted a significant amount of time to the various organizations to which ERE belonged. ERE, through Mrs. Knudsen, belonged to over 10 organizations dedicated to animal breeding. Mrs. Knudsen became active in several of these organizations.

Dr. Knudsen devoted most of his time to his medical practice. However, he spent about 15 to 20 hours per week during some months landscaping the property and handling the animals' health needs. Dr. Knudsen's participation in ERE was not immaterial.

The time and effort petitioners spent on their exotic animal breeding activity supports their contention of profit motivation. Although petitioners enjoyed breeding exotic animals, on balance we conclude that petitioners' time and effort favor their contention that the activity was engaged in for profit. See sec. 1.183-2(b)(3), Income Tax Regs.

This factor favors petitioners' position.

### 4. The Expectation That Assets Used in the Activity Would Appreciate in Value

The term "profit" encompasses revenue from operations and appreciation in the value of assets such as land. Sec. 1.183-2(b)(4), Income Tax Regs.

> Thus, the taxpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses of operation. * * * [Id.]

Petitioners argue that their expectation of profit is evidenced by the fact that a gross profit will be produced upon the sale of a third offspring. This argument is not supported by credible evidence. For example, petitioners' depreciation schedule reflects that they purchased one blue and gold macaw for $750 in 1997. Yet, in 2000, petitioners sold three blue and gold macaws for $750.

Respondent claims that petitioners could not have expected ERE's assets to appreciate so much in value as to produce an overall profit because ERE's current operating expenses each year exceeded its gross receipts by a wide margin. Respondent points out that petitioners could not realize an overall profit even if ERE's property appreciated.

We agree with respondent. During 2000 and 2001, ERE's current operating expenses significantly exceeded its gross receipts. The cost to feed the animals alone exceeded the revenue from animal sales in the above years. Despite the rising costs, petitioners continued to acquire more animals, spending $97,797 on livestock purchases in 2000 and 2001. Petitioners could not have reasonably expected an overall profit from their breeding activity.

Moreover, petitioners could not have expected that any appreciation in ERE's land would offset the losses. According to petitioners' financial statement for 2000, ERE's assets had an adjusted basis of $1,353,009, and ERE's land and improvements had an appraised current value of $109,260.

Petitioners are correct that they need prove only a bona fide expectation of profit. However, ERE's enormous losses relative to its gross receipts lead us to conclude that petitioners could not have reasonably believed their breeding activity would result in an overall future profit.

This factor favors respondent's position.

5. Petitioners' Past Success in Other Activities

The fact that a taxpayer has engaged in similar activities and converted them from unprofitable to profitable enterprises may indicate that the taxpayer is engaged in the present activity

for a profit, even though the activity is presently unprofitable. See sec. 1.183-2(b)(5), Income Tax Regs.

Petitioners presented no evidence of experience in the animal breeding business before ERE. However, petitioners argue that Dr. Knudsen's successful medical practice evidences petitioners' expectation that ERE could be successful.

Although Dr. Knudsen's medical practice was profitable, Dr. Knudsen's success relates to his extensive education and training in the medical profession. In addition, the record does not indicate whether Dr. Knudsen's medical practice was converted from an unprofitable to a profitable business. Thus, we are unable to conclude that petitioners' success with Dr. Knudsen's medical practice is probative of petitioners' profit motive with regard to ERE.

This factor is neutral.

6. Petitioners' History of Income or Loss From the Activity

A taxpayer's history of income or loss with respect to any activity may indicate the presence or absence of a profit objective. See Golanty v. Commissioner, 72 T.C. at 426; sec. 1.183-2(b)(6), Income Tax Regs. "[A] series of startup losses or losses sustained because of unforeseen circumstances beyond the control of the taxpayer may not indicate a lack of profit motive." Kahla v. Commissioner, T.C. Memo. 2000-127 (citing Engdahl v. Commissioner, 72 T.C. at 669, and sec. 1.183-2(b)(6),

Income Tax Regs.), affd. without published opinion 273 F.3d 1096 (5th Cir. 2001).

Petitioners make several arguments to defend ERE's consistent losses. First, petitioners argue that in 2001 they were still in the "initial or start-up stages" of their business. We find petitioners' argument unconvincing. We have held that the initial startup phase for a horse breeding operation is 5 to 10 years. Engdahl v. Commissioner, supra at 669. Petitioners offered no evidence to support a finding that the startup phase for an exotic animal breeding operation was more than 5 to 10 years. The years at issue were petitioners' 11th and 12th years of operation and well beyond the startup phase of their breeding activity.

Second, petitioners argue that several unforeseen events occurred that magnified their losses, and they contend that the difficulties and uncertainties in the exotic animal breeding business explain their losses. However, the setbacks ERE experienced do not explain the significant losses incurred each year.

Petitioners' losses in comparison with their revenues were substantial. From 1995 to 2002, petitioners reported losses in 8 consecutive years, which total $2,862,245.[18] During that same

_____

[18]The record does not contain financial information for the years before 1995. Petitioners introduced no evidence of any net
(continued...)

period, petitioners reported gross receipts of $442,740.  The

magnitude of petitioners' losses in comparison with their

revenues is an indication that petitioners did not have a profit

motive.  See Dodge v. Commissioner, T.C. Memo. 1998-89 (citing

Burger v. Commissioner, 809 F.2d at 360).

This factor favors respondent's position.

    7.    The Amount of Occasional Profits Generated by the
          Activity

The amount of profits earned in relation to the amount of

losses incurred, the amount of the investment, and the value of

the assets in use may indicate a profit objective.  See sec.

1.183-2(b)(7), Income Tax Regs.  The opportunity to earn

substantial profits in a highly speculative venture may be

sufficient to indicate that the activity is engaged in for profit

even though only losses are produced.  See id.  In determining

whether the taxpayer entered into the activity for profit, a

small chance of making a large profit may indicate the requisite

profit objective.  See id.

Petitioners argue that the Court should consider the gross

profits realized from the sales of animals.  However, petitioners

did not introduce evidence that the animals sales produced a

profit before operational expenses of ERE were taken into

_____

    [18](...continued)
 profit earned during 1989 through 1994.

account.[19]  Further, they introduced little evidence regarding the purchase prices of the animals or their adjusted bases in the animals.  Petitioners also assert that many of ERE's animals were capable of yielding profits.  However, a highly speculative profit potential does not outweigh the substantial losses incurred during the years of operation.  See <u>Giles v. Commissioner</u>, T.C. Memo. 2006-15; <u>McKeever v. Commissioner</u>, T.C. Memo. 2000-288.

After 12 years of operation, petitioners' exotic animal breeding activity has never generated a net profit.  Despite their extraordinary losses, petitioners continued to expand their operation and to increase their losses.[20]

This factor favors respondent's position.

### 8.   Petitioners' Financial Status

The fact that a taxpayer does not have substantial income or capital from sources other than the activity in question may indicate that the activity is engaged in for profit.  See sec. 1.183-2(b)(8), Income Tax Regs.  Substantial income from sources other than the activity (especially if the losses from the activity generate substantial tax benefits) may indicate a lack

_____

[19]Petitioners did not offer evidence enabling us to calculate the profit or loss from each sale or from the aggregate sales.

[20]During 2000 and 2001, petitioners incurred losses totaling $901,469.

of profit motive, particularly where there are elements of personal pleasure or recreation involved.  See id.

Petitioners derived a substantial amount of income from Dr. Knudsen's medical practice.  During 2000 and 2001, petitioners reported $1,710,626 in wages from Dr. Knudsen's medical practice. Although petitioners were able to reduce their taxable income by $355,239 in 2000 and 2001 because of their exotic animal breeding activity,[21] this tax benefit resulting from the activity does not prove the absence of a profit motive.  See Engdahl v. Commissioner, 72 T.C. at 670.  It is, however, a factor to be considered.  See Golanty v. Commissioner, 72 T.C. at 429.

Petitioners had sufficient financial means apart from ERE to continue their exotic animal breeding activity at a loss.  Dr. Knudsen's medical practice provided the funds to continue ERE's operations.  Many deposits into ERE's bank account consisted of checks drawn from Dr. Knudsen's medical practice.

Petitioners' substantial income from Dr. Knudsen's medical practice, which was offset by ERE's losses, supports a conclusion that petitioners lacked the required profit motive.

This factor favors respondent's position.

---

[21]From 1995 to 2002, petitioners used their losses from ERE to reduce their Federal income tax liability by $1,145,944.

### 9.  Elements of Personal Pleasure or Recreation

The existence of personal pleasure or recreation relating to the activity may indicate the absence of a profit objective.  See sec. 1.183-2(b)(9), Income Tax Regs.  An activity will not be treated as not engaged in for profit merely because the taxpayer has purposes or motivations other than to make a profit.  Id.

Petitioners argue that although they derived some pleasure from operating ERE, many important duties were not for pleasure or recreation.  Respondent argues that the improvements to ERE's facilities were lavish and made only for the enjoyment of petitioners.  Respondent also points to the fact that Mrs. Knudsen treated the animals like house pets.

We agree with respondent that elements of personal pleasure and recreation were present in petitioners' exotic animal breeding activity.  However, as we stated above, some component of personal pleasure does not negate a bona fide profit motive. "[A] business will not be turned into a hobby merely because the owner finds it pleasurable; suffering has never been made a prerequisite to deductibility.  'Success in business is largely obtained by pleasurable interest therein.'"  Jackson v. Commissioner, 59 T.C. at 317 (quoting Wilson v. Eisner, 282 F. 38, 42 (2d Cir. 1922)); see also sec. 1.183-2(b)(9), Income Tax Regs.

In addition to caring for the animals, petitioners spent a significant amount of time maintaining and improving ERE's facilities.  Mrs. Knudsen regularly performed duties that were not pleasurable or recreational, such as cleaning animal cages and stalls and disposing of animal carcasses.  As a result of her duties, she also suffered several physical injuries.  Dr. Knudsen personally did most of the landscaping on the property to provide the animals with a natural habitat.

The record does not contain evidence that petitioners' facilities were extravagant or that they were not constructed for the benefit of the animals.  Petitioners maintained their property in accordance with USDA regulations.  In addition, petitioners constructed a home on the property, at least in part, to enable them to care for their animals.

Although petitioners derived some pleasure from their exotic animal breeding activity, we conclude that petitioners were not engaged in the activity solely for personal pleasure or recreation.

This factor is neutral.

C.   Conclusion

After considering the factors listed in section 1.183-2(b), Income Tax Regs., all contentions presented by the parties, and the unique facts and circumstances of this case, we conclude that petitioners did not enter the exotic animal breeding activity

with a primary objective of realizing a profit.  We hold that petitioners' exotic animal breeding activity during the years in issue was not an activity engaged in for profit within the meaning of section 183.

III.  Respondent's Alternative Position

Respondent argues that if we find that petitioners' exotic animal breeding activity was conducted for profit, petitioners' claimed Schedule F expense deductions on their 2000 and 2001 income tax returns should be reclassified as capital expenses and depreciated, and certain expenses should be disallowed for lack of substantiation.  Because we find that petitioners' exotic animal breeding activity was not an activity engaged in for profit during 2000 and 2001, we need not address respondent's alternative position.

To reflect the foregoing,

Decision will be

entered for respondent.