T.C. Memo. 2019-64

UNITED STATES TAX COURT

MITCHEL SKOLNICK AND LESLIE SKOLNICK, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 24649-16, 24650-16,      Filed June 3, 2019.
24980-16.

B. Paul Husband and Erin C. Prutow, for petitioners.

Kristina L. Rico, Kirsten E. Brimer, Harry J. Negro, and Brian S. Jones, for

respondent.

---

[1]Cases of the following petitioners are consolidated herewith:  Mitchel
Skolnick and Brianna Skolnick, docket No. 24650-16; and Eric Freeman, docket
No. 24980-16.

[*2]                     MEMORANDUM OPINION

LAUBER, Judge:  These consolidated cases were tried at a special session

of the Court beginning April 8, 2019, in Philadelphia, Pennsylvania.  A central

question is whether petitioners' horse-related activity, undertaken through Blue-

stone Farms, LLC (Bluestone Farms), constituted an "activity not engaged in for

profit" within the meaning of section 183.[2]  Currently before the Court is a motion

in limine filed by respondent seeking to exclude from evidence the expert witness

report of David Reid.  Petitioners filed an objection to the motion, and the Court

heard argument at the outset of trial and again following respondent's voir dire of

Mr. Reid.  We will grant the motion and exclude Mr. Reid's report.

                            Background

Petitioners proposed Mr. Reid as an expert to value their herd of horses at

two times.  Mr. Reid is the owner of Preferred Equine Marketing, Inc. (Preferred

Equine), a bloodstock agency for the standardbred horse industry.  He avers that

since 1986 his company has served as an agent for sellers (and occasionally for

buyers) at numerous public auctions and private sales of standardbred horses.  He

_____

[2]All statutory references are to the Internal Revenue Code in effect at all
relevant times, and all Rule references (unless otherwise noted) are to the Tax
Court Rules of Practice and Procedure.  We round all monetary amounts to the
nearest dollar.

**[*3]** avers that Preferred Equine is now the leading bloodstock agency in North America and has participated since 1989 in auction sales of 20,000 horses generating gross proceeds of at least $500 million. Indicating some familiarity with our Rules, Mr. Reid disclosed that he has not authored a publication during the past 10 years and has not testified as an expert witness during the past 4 years. See Rule 143(g)(1)(D) and (E).

Mr. Reid's proposed testimony consists of a 3-1/2-page report with a pair of attached spreadsheets. The substance of his report (putting aside paragraphs devoted to formal aspects and his qualifications) consists of three paragraphs that take up less than two pages. He opines that "the appraisal of horses is not an exact science and is greatly influenced by numerous economic and social factors." In particular, he states that the valuation of horses "can be affected in a volatile way as a result of any natural disaster, disease outbreaks, global crisis or governmental actions."

In paragraph 4 of his report Mr. Reid sets forth "brief guidelines" that he considers relevant in valuing different types of horses. For weanlings and yearlings he says that "conformation and sire play a vital role." For broodmares he says that "breeding status, soundness, health conditions and performance of off

**[*4]** spring remain strong factors in evaluation." For stallions and stallion shares[3] he says that "breeding soundness, fertility or lack of, overall health conditions and performance of offspring are strong factors in evaluation."

Attached to Mr. Reid's report are two spreadsheets. The first spreadsheet lists 93 horses (or stallion shares) allegedly owned by Bluestone Farms in August 2010. The second spreadsheet lists 60 horses (or stallion shares) allegedly owned by Bluestone Farms in August 2017. Mr. Reid compiled these spreadsheets near the time of preparing his report in February 2019.

Each spreadsheet lists horses by category (weanlings, yearlings, broodmares, stallions/stallion shares, racehorses, and retired horses). For each horse the spreadsheet shows the sex, year of birth, parents (sire and dam), and Bluestone Farms' ownership percentage. The final column of each spreadsheet shows the "appraised value of Bluestone Farms' interest" in each horse. Putting aside retired horses, which he values at $1 each, the appraised values range from $2,500 to $1,900,000.

Mr. Reid does not explain, in his report or in the attached spreadsheets, how he arrived at these values. Rather he states: "In evaluating this herd, I based the values assigned on our experience in the marketplace for the past 25 years along

---

[3]A stallion share is an interest in a syndicate that owns a stallion.

**[\*5]** with our sales database from previous sales within the industry."[4] Mr. Reid does not explain how he used data from the database to generate his assigned values, nor does he include the database as an exhibit to his report.

## Discussion

Tax Court proceedings are conducted in accordance with the Federal Rules of Evidence (Fed. R. Evid.). See sec. 7453; Rule 143(a). Testimony by expert witnesses is governed by Fed. R. Evid. 702 and 703. The former provides that a witness who is "qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if his testimony will help the trier of fact and the following conditions are met:

• the testimony is based on sufficient facts or data;

• the testimony is the product of reliable principles and methods; and

• the expert has reliably applied the principles and methods to the facts of the case.

In the Tax Court, a party who calls an expert witness must cause that witness to prepare a written report, which is served on the opposing party and lodged with the Court before trial. See Rule 143(g)(1). The pretrial order in these cases

---

[4]Mr. Reid does not list a coauthor for his report, but he testified during voir dire that "our experience" refers to his own experience and that of his late business partner, who died in 2012.

**[\*6]** directed that the last day to exchange and submit to the Court expert witness reports was February 26, 2019.  If the expert is qualified, his report is "received in evidence as the direct testimony of the expert witness."  Rule 143(g)(2).

Because the written report serves as the direct testimony of the expert witness, the report must comply with the requirements for expert testimony set forth in Fed. R. Evid. 702.  Rule 143(g)(1) accordingly requires that an expert witness report "shall contain" (among other things) the following:  "(A) a complete statement of all opinions the witness expresses and the basis and reasons for them; (B) the facts or data considered by the witness in forming * * * [his opinions]; [and] (C) any exhibits used to summarize or support * * * [his opinions.]"

We conclude that Mr. Reid's report does not satisfy the requirements of the Federal Rules of Evidence or this Court's Rules.  His report does not set forth any "facts or data" on which he relied.  Fed. R. Evid. 702(b); Rule 143(g)(1)(B).  Although he avers that he consulted an in-house database, his report includes no data from that database, and he does not attach a printout of the database as an exhibit to his report.  He does not identify the valuation "principles and methods" that he employed in performing his appraisal.  See Fed. R. Evid. 702(c).  Although his "brief guidelines" list nine factors that he believes affect valuation, he does not explain how he applied or weighted those factors when attaching a dollar figure to

**[*7]** each horse.  His report thus fails to establish that he "reliably applied the prin-ciples and methods to the facts of the case."  <u>See</u> Fed. R. Evid. 702(d).

Mr. Reid avers that the valuation of horses "can be affected in a volatile way" by external factors such as "governmental actions."  The testimony at trial indicated that certain governmental actions by the States of New Jersey and Penn-sylvania may have had effects (beneficial or detrimental) on the standardbred in-dustry generally and particularly on Bluestone Farms, which is near Trenton, New Jersey.  Mr. Reid does not mention these governmental actions and does not ex-plain what effect those actions might have had on the value(s) of Bluestone Farms' horses as of 2010 and 2017, his selected valuation dates.

Mr. Reid avers that a horse's conformation, overall health conditions, breeding/pregnancy status (for broodmares), and fertility or lack thereof (for stal-lions) play "vital" or "strong" roles in valuing horses.  His report includes no in-formation on any of these points with respect to any of the 153 horses (and stallion shares) that he appraised.  His report does not indicate that he personally viewed any of the horses.  And his report does not explain what (if any) data he consulted in order to evaluate, in February 2019, the conformation, health conditions, breeding/pregnancy status, or fertility of the horses owned by Bluestone Farms in August 2010 and August 2017, respectively.

**[\*8]** Testimony based on scientific, technical, or other specialized knowledge is subject to the Court's gatekeeping function, which forecloses expert testimony that does not "rest[] on a reliable foundation" or is not "relevant to the task at hand." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993); see Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149 (1999) (extending the principles of Daubert to all expert testimony). "In exercising this function, trial judges have 'considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" Santa Monica Pictures, LLC v. Commissioner, T.C. Memo. 2005-104, 89 T.C.M. (CCH) 1157, 1237 (quoting Kumho Tire Co., 526 U.S. at 152); see Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 85 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); cf. ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 293 (3d Cir. 2012) ("Under the deferential abuse of discretion standard, we will not disturb a district court's decision to exclude testimony unless we are left with 'a definite and firm conviction that the court below committed a clear error of judgment.'" (quoting In re TMI Litig., 193 F.3d 613, 666 (3d Cir. 1999), amended, 199 F.3d 158 (3d Cir. 2000))).

We conclude that Mr. Reid's testimony, as embodied in his written report, does not "rest on a reliable foundation" because it does not set forth the facts or data on which he relied, the methodology he employed, or the manner in which he

**[\*9]** applied to the facts of these cases the valuation factors he deemed relevant. The dollar values he assigns range from $2,500 to $1,900,000, but the totality of his "appraisal" of each horse is simply a number inserted into a box on a spreadsheet. This amounts to an ipse dixit. Because he offers no explanation or analysis to show how he derived these dollar figures, his testimony does not meet the requirements of Fed. R. Evid. 702 or Rule 143. See Oddi v. Ford Motor Co., 234 F.3d 136, 158 (3d Cir. 2000) (noting that an expert's "ipse dixit does not withstand Daubert's scrutiny"); Giles v. Commissioner, T.C. Memo. 2006-15, 91 T.C.M. (CCH) 684, 692-693 (rejecting report of horse appraiser who summarily described her methodology as resting on "comparable values of horses").

During oral argument petitioners urged four reasons why we should reach a different conclusion. First, they noted that they had supplied to respondent, four days before trial, a thumb drive containing Mr. Reid's in-house database. This 11th-hour action does not meet the requirements of our Rules. Rule 143(g)(1) expressly requires that the report itself include the facts and/or data considered by the witness in forming his opinions.

Mr. Reid's in-house database evidently includes hundreds or thousands of horse sales, very few of which would be linked or correlated to the horses owned by Bluestone Farms at the relevant times. It is unreasonable to expect respond-

**[*10]** ent's counsel, four days before trial, to get on top of a massive database and be prepared to use it in cross-examining Mr. Reid. We find that the failure to provide this database to respondent in a timely fashion--viz., on February 26, 2019, when expert witness reports were required to be exchanged--has caused undue prejudice by "significantly impairing the opposing party's ability to cross-examine the expert witness" and "by denying the opposing party the reasonable opportunity to obtain evidence in rebuttal to the expert witness's testimony." Rule 143(g)(2); see In re TMI Litig., 193 F.3d at 722 (upholding the exclusion of expert testimony where "the substance of the experts' reports" was disclosed too late for the opposing party to prepare cross-examination); Boltar, LLC. v. Commissioner, 136 T.C. 326, 337-340 (2011) (declining to permit a late-filed supplement to an incomplete expert report because it "would prejudice respondent in preparing rebuttal and would undermine the purpose of pretrial exchange of expert reports").[5]

---

[5]Even if we accepted the late-provided database as part of Mr. Reid's report, it would not save his report from the lack of a defined methodology or from the failure to show how he applied valuation principles to the facts of these cases. See Elcock v. Kmart Corp., 233 F.3d 734, 749 (3d Cir. 2000) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." (quoting Kumho Tire Co., 526 U.S. at 157)).

**[*11]** Second, petitioners urge that, under the Federal Rules of Evidence, a witness can be qualified as an expert by experience alone. That is correct. But Fed. R. Evid. 702 provides that a witness who is qualified as an expert by experience may testify in the form of an opinion "if" specified conditions are met. Those conditions are that the testimony "is based on sufficient facts or data," "is the product of reliable principles and methods," and reflects the reliable application of those principles and methods to the facts of the case. Mr. Reid's report does not satisfy these conditions. While an expert can be qualified on the basis of his experience, he cannot cite his experience as the sole basis for putting a dollar value on a horse. He must show his work, viz., the data he considered and the methodology he applied to produce his results. See Feinberg v. Commissioner, T.C. Memo. 2017-211, 114 T.C.M. 471, 472-473 (excluding appraisal testimony where expert did not provide sufficient data to show that "the opinions expressed are based on anything other than his own conjecture"), aff'd, 916 F.3d 1330 (10th Cir. 2019); Giles, 91 T.C.M. (CCH) at 692-693 (rejecting appraisal testimony where expert failed to explain the nature of her methodology and the reasons for her conclusions).

Third, petitioners note Mr. Reid's voir dire testimony that he regularly used spreadsheets resembling those attached to his expert report to supply information

**[\*12]** to clients of his bloodstock agency. But what is acceptable in a commercial context is not necessarily reliable as expert testimony in Federal court. A person intending to bid on a horse may rely on a dollar estimate supplied by his blood-stock agent, much as a person intending to bid on a house may rely on a dollar estimate supplied by his realtor. In neither case may the customer be interested in how his agent came up with that number. But under our adversarial system, the Federal Rules of Evidence impose higher standards for expert witness testimony in Federal court. See Fed. R. Evid. 702, Adv. Comm. Note to 2000 Amendment ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1319 (9th Cir. 1995))).

Finally, petitioners assert that the valuation of horses is more art than science, citing Justice Stewart's famous apothegm from a different context: "I know it when I see it." Jacobellis v. Ohio, 378 U.S. 184, 197 (1964) (Stewart, J., concurring). This may be a practical approach to identifying pornography, but it is not, for the reasons we have stated, an acceptable approach to formulating expert appraisal testimony under the Federal Rules. We accept petitioners' point that an expert appraising a herd of horses need not necessarily supply, for each horse, the massive volume of data that courts customarily receive from experts appraising

[*13] real estate. But the horse appraiser must still explain how he got to his results, which requires that he show the data he considered, the methodology he applied, and the manner in which he applied his methodology to reach his valuation outcomes. Without that information, the Court has no means of examining whether the report "rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597.

To reflect the foregoing,

An order will be issued granting respondent's motion in limine.